IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

Matthew Thomas Parkins, by and through )
Andrew Turner, his next of friend and )
Guardian ad Litem, and Matt Parkins, )
Individually, )
)                    C.A. No. 7:21-2641-HMH
                    Plaintiffs, )
)                    **OPINION & ORDER**
            vs. )
)
The State of South Carolina, Henry Dargan )
McMaster, The Office of the Governor, )
Michael Leach, The South Carolina )
Department of Social Services, Calvin Hill, )
Tomekia Means, Joshua Baker, Robert Kerr, )
The South Carolina Department of Health )
and Human Services, Althea Myers, Patrick )
Maley, Michelle Gough Fry, The South )
Carolina Department of Disabilities and )
Special Needs, The Laurens County )
Disabilities and Special Needs Board, )
The Spartanburg Regional Health Care )
System, The Union Medical Center, )
Tonya Renee Washington, M.D., )
Jan Bradley, John Roe, and Jane Roe, )
)
                    Defendants. )

This matter is before the court on the following motions:

(1) motion to dismiss for failure to state a claim by Defendants Jan Bradley
("Bradley"), Spartanburg Regional Health Care System ("SRHCS"), Union Medical
Center ("UMC"),[1] and Tonya Renee Washington, M.D. ("Dr. Washington")
(collectively "SRHS Defendants");

(2) motion to dismiss for failure to state a claim by Defendant Henry Dargan
McMaster ("Governor McMaster"); and

---

[1] SRHCS and UMC assert that they are both "properly and legally identified as
'Spartanburg Regional Health Services District, Inc.'" (Mot. Dismiss 1, ECF No. 41.)

(3) motion to dismiss for failure to state a claim by Defendants Joshua Baker ("Baker"), Michelle Gough Fry ("Fry"), Robert Kerr ("Kerr"), The Laurens County Disabilities and Special Needs Board ("LCDSNB"), Patrick Maley ("Maley"), Althea Myers ("Myers"), The South Carolina Department of Disabilities and Special Needs ("DDSN"), and The South Carolina Department of Health and Human Services ("DHHS").

For the reasons set forth below, the court grants Governor McMaster's motion, ECF No. 42, grants the SRHS Defendants' motion, ECF No. 41, and grants in part and denies in part Defendants Baker, Kerr, DHHS, Myers, Maley, Fry, DDSN, and LCDSNB's motion to dismiss, ECF No. 43.

## I. FACTUAL AND PROCEDURAL BACKGROUND

For purposes of these motions, all *plausible* facts alleged in Plaintiffs' amended complaint, ECF No. 32, are accepted as true. This action was removed to this court on August 18, 2021. (Not. Removal, ECF No. 1.) The initial 62-page complaint consisted of 513 single spaced paragraphs, many quite lengthy, and alleged claims against the named Defendants for the following causes of action: (1) violation of Title II of the Americans with Disabilities Act and § 504 of the Rehabilitation Act; (2) violations of 42 U.S.C. § 1983; (3) common law civil conspiracy; (4) federal conspiracy in violation of 42 U.S.C. § 1985; (5) gross negligence; (6) violations of the South Carolina constitution; (7) declaratory judgment; and (8) unjust enrichment. (Id. Ex.1 (State Court Documents), ECF No. 1-1.)

The vast majority of the Defendants filed motions to dismiss the complaint or motions for a more definite statement. (Mots. Dismiss, ECF Nos. 9-11, 15, 17, and 23.) On October 6, 2021, the court denied the motions to dismiss without prejudice and ordered Plaintiffs to file and serve an amended complaint, limited to no more than 35 pages in length in compliance with

Local Civil Rule 1.05.  (Order Denying Mots. Dismiss, ECF No. 27.)  Further, the court ordered

that with respect to each cause of action asserted, "Plaintiffs shall plainly state in the first

paragraph the specific defendants against whom that cause of action is asserted."  (Id. 3,

ECF No. 27.)

On October 26, 2021, Plaintiffs filed an amended complaint.  (Am. Compl.,

ECF No. 32.)  The amended complaint alleges the following causes of action: (1) violations of

Title II of the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act

("Section 504");  (2) violations of 42 U.S.C. § 1983; (3) South Carolina common law civil

conspiracy;  (4) South Carolina common law gross negligence; and (5) declaratory judgment and

unjust enrichment.  (Id. generally, ECF No. 32.)

### A. General Allegations

The amended complaint alleges that Matthew Thomas Parkins ("Matthew") "is a

24-year-old man who has a severe, life-threatening disorder called 'congenital adrenal

insufficiency + hypogonadotrophic (sic) hypogonadism' caused by an acute adrenal crisis in

infancy[,] which resulted in profound and permanent developmental delay."  (Am. Compl.

¶ 23, ECF No. 32.)  As a result of this condition, Matthew utilizes a wheelchair at school, but at

home he is able to move about freely by "crawling or 'scooting' on the floor independently and

walking with hands-on assistance."  (Id. ¶  34, ECF No. 32.)  In order to treat Matthew's

condition, his primary care physician, Dr. James Amrhein ("Dr. Amrhein"), a pediatric

endocrinologist, prescribed two cortisone drugs and monthly testosterone injections to manage

this adrenal disorder.  (Id. ¶ 25, ECF No. 32.)  Side effects of these drugs include impaired

healing, fragile skin, and bruising.  (Id. ¶ 26, ECF No. 32.)  Matthew also receives home support

services through the Intellectual Disability/Related Disability ("ID/RD") Medicaid waiver which

is operated by DDSN under contract with DHHS.[2]  (Id. ¶ 29, ECF No. 32.)  Additionally,

Matthew has received professional counseling services from Lennie Mullis ("Mullis").

(Am. Compl. ¶ 31, ECF No. 32.)  Further, Matthew's treatment at home has been closely

monitored by Mary Katherine Bagnal ("Bagnal"), a "masters level social worker," and Michelle

Nunn ("Nunn").  (Id. ¶ 32, ECF No. 32.)  Matthew's father, Matt Parkins ("Parkins"), serves as

his primary caregiver and provides Matthew with assistance for all activities of daily living.

(Id. ¶ 24, ECF No. 32.)

In spring 2018, Matthew was completing his senior year of school at Union High School.

(Id. ¶ 33, ECF No.32.)  On April 16, 2018, Matthew was removed from Parkins' custody and

placed by law enforcement in adult emergency protective custody ("EPC") "when unexplained

bruises were discovered on his thighs."  (Id. ¶¶ 35-36, ECF No. 32.)  Andrew Turner ("Turner"),

another caregiver and Matthew's "next of friend" in this action, informed law enforcement that

"he had not seen Matthew since April 12, that [Parkins] provided excellent care to Matthew, and

that he never witnessed any signs of abuse . . . ."  (Am. Compl. ¶ 42, ECF No. 32.)

As required under South Carolina law, law enforcement notified Adult Protective

Services and DSS.  See S.C. Code Ann. § 43-35-55(D) ("When a law enforcement officer takes

protective custody of a vulnerable adult . . ., the law enforcement officer must immediately

---

[2] "The ID/RD waiver provides services as an alternative to institutional care for persons who meet 'level of care' for ICF/ID placement, but choose to live in their own homes."  (Am. Compl. ¶ 30, ECF No. 32.)

notify the Adult Protective Services and the Department of Social Services . . . .").  DSS

supervisor  Calvin Hill ("Hill") assigned Tomekia Means[3] ("Means") to investigate any potential

abuse pursuant to the South Carolina Omnibus Protection Act.  (Id. ¶ 36, ECF No. 32.)

Matthew was taken to UMC, where physicians described him as a "'well appearing

21-year-old male,' with bruising noted on his backside."  (Id. ¶ 43, ECF No. 32.)  His initial plan

of care stated that he "will be admitted and will be discharged . . . when [he] has a decision from

the judge."  (Id. ¶ 44, ECF No. 32.)  Matthew's care was "turned over to the UMC attending

physician, Dr. Washington."  (Id. ¶ 45, ECF No. 32.)  Means "directed . . . Matthew be secluded

in his room, with sitters bedside who were instructed not to allow Matthew to get out of bed for

any purpose," and only permitted family members to visit him for one hour, once a week.  (Am.

Compl. ¶¶ 46, 59, ECF No. 32.)

Bagnal and Nunn visited Matthew to photograph the bruising on April 17, 2018.

(Id. ¶ 47, ECF No. 32.)  While there, Bagnal informed Means that Matthew's bruises were

consistent with Parkins' explanation that the bruises occurred while Matthew was being lifted.

(Id. ¶ 47, ECF No. 32.)  Further, Bagnal told Means that Parkins was "an exceptional caregiver

who would never intentionally injure his son and that Matthew should immediately be returned

home."  (Id. ¶ 48, ECF No. 32.)

---

[3] Plaintiffs refer to Tomekia Means as "Tomeka Grooms" in paragraph 36 of the
amended complaint.  However, elsewhere throughout the amended complaint, and in the
caption, she is referred to as "Tomekia Means."  (Am. Compl. ¶ 10, ECF No. 32.) ("Tomekia
Means ('Means') was the DSS case manager assigned to investigate Matthew's case . . . .")

The same day, DSS filed a complaint in South Carolina state Family Court alleging that Parkins and Turner had physically abused Matthew.[4]  (Id. ¶ 50, ECF No. 32.)  A hearing was scheduled for April 18, 2018 and a summons was filed which required Parkins and Turner to attend.  Plaintiffs allege that DSS did not provide at least forty-eight hours' written notice of the hearing, pursuant to S.C. Code Ann. § 63-3-570.  (Am. Compl. ¶ 51, ECF No. 32.)  Plaintiffs also submit that Matthew was not present at that hearing, and no guardian ad litem or attorney had been appointed to represent his interests.  (Id. ¶ 55, ECF No. 32.)  Further, Plaintiffs contend that Parkins and Turner were not served with notice of the hearing and had no counsel representation at the hearing.  (Id. ¶ 55, ECF No. 32.)

At the hearing on April 18, DSS informed the family court that "[b]y reason of abuse, neglect or exploitation, there is a substantial risk to this vulnerable adult's life or physical safety, and the vulnerable adult is unable to be protected."  (Id. ¶ 52, ECF No. 32.)  The Family Court issued an order stating that Matthew would remain in DSS custody, directing DSS to conduct a further investigation into the alleged abuse, and authorizing DSS to provide "such routine and/or emergency care as may be required . . . ."  (Id. ¶¶ 53, 56, ECF No. 32.)  Further, the order states that: "(1) An [sic] guardian ad litem and guardian attorney shall be appointed to Matthew Parkins; (2) Matthew [P]arkins will remain in dss custod [sic]; and (3) DSS shall expedite an investigation."  (Id. ¶ 56, ECF No. 32.)

Plaintiffs allege that DSS, along with the other named Defendants, then pursued placement of Matthew in a DDSN group home and failed to consider Matthews's right to a less

---

[4] DSS is "responsible for filing a petition for protective custody within one business day of receiving the notification" that law enforcement has taken protective custody of a vulnerable adult.  S.C. Code Ann. § 43-35-55(E)

6

restrictive placement.  (Am. Compl., e.g., ¶ 58, ECF No. 32.)  Specifically, Plaintiffs allege that

Defendants "Washington, Means, Hill, Bradley and Myers, along with other employees at UMC,

DSS, DHHS, DDSN and LCDSNB concocted a clandestine plan to illegally institutionalize

Matthew in an ICF/ID facility[5] called 'Clinton Manor' in another county."  (Id. ¶ 79,

ECF No. 32.)  Further, Plaintiffs allege that Matthew received inadequate care while

hospitalized and was denied physical, occupational, and psychological therapies.  (Id. ¶¶ 60-67,

77-78, ECF No. 32.)

Plaintiffs allege that Matthew was released without a court order to Parkins' custody on

May 18, 2018, after a state senator intervened to halt the transfer to Clinton Manor.  (Id. ¶¶ 108,

113, ECF No. 32.)  A trial was scheduled for May 22, 2018.  (Id. ¶ 113, ECF No. 32.) Plaintiffs

contend that throughout the time period in question, the Defendants ignored evidence provided

by Matthew's mother, Union County Sheriff's Deputy Roxy Belue, Bagnal, Matthew's social

worker, and Matthew's counselor, Mullis, that Parkins provided excellent care to Matthew at

home and that he would not intentionally harm Matthew.  (Am. Compl. ¶¶ 48, 57-58, 78,

ECF No. 32.)  Ultimately, on May 23, 2018, the Family Court dismissed the charges and found

that "Cecil[,] Matt Parkins[,] and Andrew Turner have at all times provided exceptional care to

Matthew Parkins."  (Id. ¶ 120, ECF No. 32.)

## B. DSS Defendants

Plaintiffs have asserted claims against DSS, as the agency responsible for investigating

the allegations of abuse; Michael Leach ("Leach"), in his official capacity as director of DSS;

---

[5] The Plaintiffs allege that "[a]n ICF/ID is the most restrictive residential placement in the DDSN system . . . ."  (Am. Compl. ¶ 80, ECF No. 32.)

Means, the case manager assigned to Matthew's case; and Calvin Hill ("Hill"), Means'

supervisor (collectively "DSS Defendants"). (Id. ¶¶ 7-10.) These DSS Defendants filed an

answer to the amended complaint on November 23, 2021. (Ans., ECF No. 40.) To date, no

motions have been filed on behalf of the DSS Defendants.

### C. SRHS Defendants - SRHCS, UMC, Dr. Washington, Bradley

SRHCS "owns the Union Medical Center (UMC), which provided medical treatment to

Matthew." (Am. Compl. ¶ 19, ECF No. 32.) Dr. Washington "was Matthew's attending

physician at UMC." (Id. ¶ 20, ECF No. 32.) Jan Bradley "was the social worker . . .

responsible for Matthew['s] [] case management at UMC." (Id. ¶ 21, ECF No. 32.)

Plaintiffs allege that Dr. Washington failed to properly monitor Matthew's adrenal

disorder, administered his testosterone injections at incorrect intervals, prescribed him

unnecessary medications without consulting his primary care physician, and "failed to provide

needed physical, occupational[,] or psychological therapies" during his time at UMC.

(Id. ¶¶ 62-65, 67, ECF No. 32.) As a result, Plaintiffs allege that "Matthew went into a life-

threatening adrenal crisis . . ." while under UMC's care. (Id. ¶ 77, ECF No. 32.)

Further, Plaintiffs have alleged that UMC and Dr. Washington, along with other

Defendants in this case, "concocted a clandestine plan to illegally institutionalize Matthew in an

ICF/ID facility called 'Clinton Manor' in another county." (Id. ¶ 79, ECF No. 32.) In

furtherance of this conspiracy, Plaintiffs submit that "[t]hese Defendants schemed to sedate and

chemically restrain Matthew in preparation for the transfer to Clinton Manor, using a

psychotropic drug used to treat schizophrenia, Xyprexa, despite Matthew never having been

diagnosed with or [having] shown signs of schizophrenia." (Am. Compl. ¶ 93, ECF No. 32.)

8

Plaintiffs further allege that a different drug, Seroquel, also primarily used to schizophrenia, was substituted in order to sedate Matthew "for the convenience of the staff at Clinton Manor." (Id. ¶ 96, ECF No. 32.)  Plaintiffs allege that UMC, Dr. Washington, and Bradley participated in making Matthew's transfer arrangements to Clinton Manor "without initiating involuntary commitment proceedings . . . ."  (Id. ¶ 99, ECF No. 32.)

### D. Governor McMaster and the Office of the Governor[6]

Governor McMaster is the governor of South Carolina.  Plaintiffs allege that Governor McMaster has "consciously disregarded [his] obligations to enact a 'comprehensive, effectively working plan' for the State, as described by the Supreme Court in Olmstead v. L.C. ex rel Zimring, 527 U.S. 581, 607 (1999) . . . and U.S. Department of Justice Regulations and directives."  (Am. Compl. ¶144, ECF No. 32.)

### E. DDSN, DHHS, LCDNSB, Patrick Maley, Michelle Gough Fry, Joshua Baker, Robert Kerr, Althea Myers

DDSN "is responsible for providing services to South Carolinians with intellectual disabilities and for the administration of the ID/RD Medicaid waiver program, under contract with DHHS."  (Id. ¶ 15, ECF No. 32.)  Patrick Maley "was the interim director of DDSN from November 2017 through July 2018[,] and he is now Chief Financial Officer of DDSN." (Id. ¶ 16, ECF No. 32.)  Michelle Gough Fry "is the current Director of DDSN."  (Id. ¶ 17, ECF No. 32.)

---

[6] Governor McMaster alleges that the Office of the Governor has not been served with process.  (Mot. Dismiss 4 n.3, ECF No. 42.)  Accordingly, the Office of the Governor is not subject to the court's jurisdiction.  Choice Hotels Int'l., Inc. v. Bonham, No. 96-2717, 1997 WL 600061 at * 1 (4th Cir. Sept. 30, 1997) (per curiam) (unpublished) ("Valid service of process is a prerequisite to a district court's assertion of personal jurisdiction.") (quoting Swaim v. Moltan Co., 73 F.3d 711, 719 (7th Cir. 1996)).

DHHS "is the state agency responsible for the administration of all Medicaid programs in the [s]tate."  (Id. ¶ 11, ECF No. 32.)  Joshua Baker "was the director of DHHS from 2017 until 2021, having previously served as director of DHHS operations."  (Am. Compl. ¶ 12, ECF No. 32.)  Robert Kerr "provided 'consulting' services on Medicaid reimbursement issues [for] DDSN and its agents[,] and he was appointed by [Governor] McMaster as Director of DHHS in 2021."  (Id. ¶ 13, ECF No. 32.)  Althea Myers "is an employee of DHHS' Community Long Term Care Division. . . ."  (Id. ¶ 14, ECF No. 32.)  LCDSNB is the local agency responsible for operating Clinton Manor.  (Id. ¶ 18, ECF No. 32.)

### F. Motions Before the Court[7]

On November 23, 2021, the following motions were filed: (1) motion to dismiss for failure to state a claim by the SRHS Defendants (Bradley, SRHCS, UMC, and Dr. Washington); (2) motion to dismiss for failure to state a claim by Governor McMaster; and (3) motion to dismiss for failure to state a claim by Defendants Baker, Fry, Kerr, LCDSNB, Maley, Myers, DDSN, and DHHS.  (Mots. Dismiss, ECF Nos. 41, 42, 43.)  Plaintiffs filed responses in opposition on December 21, 2021.  (Resp. Opp'n, ECF Nos. 46, 47, 48.)  Defendants filed their replies on January 4, 2022 and January 7, 2022.  (Replies, ECF Nos. 51, 52, 54.)  This matter is now ripe for review.

---

[7] Plaintiffs' request for a hearing on these motions is denied.  See Local Civil Rule 7.08 of the District of South Carolina.  ("Hearings on motions may be ordered by the court in its discretion.  Unless so ordered, motions may be determined without a hearing.").

## II. DISCUSSION OF THE LAW

### A. Legal Standard

To withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (internal quotation marks omitted). While a complaint "does not need [to allege] detailed factual allegations," pleadings that contain mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555.

Further, while the court accepts plausible factual allegations made in the complaint as true and considers those facts in the light most favorable to a plaintiff in ruling on a motion to dismiss, a court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Eastern Shore Mkt's Inc. v. J.D. Assoc's, LP, 213 F. 3d 175, 180 (4th Cir. 2000). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Iqbal, 556 U.S. at 678 (internal quotation marks omitted). Stated differently, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.'" Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## B.  Applicable Law

### 1.  Title II of the Americans with Disabilities Act and § 504 of the Rehabilitation Act

The Plaintiffs allege violations of Title II of the ADA and Section 504 of the Rehabilitation Act.  "Claims under the ADA's Title II and [Section 504] can be combined for analytical purposes because the analysis is 'substantially the same.'"  Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty., 673 F.3d 333, 336 n.1 (4th Cir. 2012) (quoting Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1265 n.9 (4th Cir. 1995)); Halpern v. Wake Forest Univ. Health Sciences, 669 F.3d 454, 461 (4th Cir. 2012) ("To the extent possible, [the court will] construe [Title II] and [Section 504] to impose similar requirements.").  Title II creates a remedy for "any person alleging discrimination on the basis of disability" and provides that the "remedies, procedures, and rights" available under Title II are the "remedies, procedures, and rights set forth in section 794a of [the Rehabilitation Act]."  42 U.S.C. § 12133.  Section 794a of the Rehabilitation Act, in turn, provides that the available "remedies, procedures, and rights" are those set forth in Title VII of the Civil Rights Act.  29 U.S.C. § 794a(a)(1).  To be eligible for any protection under the ADA, an individual must be disabled within the meaning of the Act. The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).  With regard to discrimination, 42 U.S.C. § 12132 states:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

Additionally, under 42 U.S.C. § 12131(1), the definition of "public entity" means:

(A)    any State or local government;

(B)    any department, agency, special purpose district, or other instrumentality of
State or States or local government; and

(C)    the National Railroad Passenger Corporation, and any commuter authority
(as defined in section 24102(4) of Title 49).

With regard to nondiscrimination under Federal grants and programs under the

Rehabilitation Act, 29 U.S.C. § 794 states:

No otherwise qualified individual with a disability in the United States, as defined
in section 705(20) of this title, shall, solely by reason of her or his disability, be
excluded from the participation in, be denied the benefits of, or be subjected to
discrimination under any program or activity receiving Federal financial assistance.
. . .

29 U.S.C. § 794(a).  "[T]he term "program or activity" means all of the operations of--"

(1) (A)    a department, agency, special purpose district, or other instrumentality of a State
or of a local government; or

(B)    the entity of such State or local government that distributes such assistance and
each such department or agency (and each other State or local government
entity) to which the assistance is extended, in the case of assistance to a State or
local government;

(2) (A)    a college, university, or other postsecondary institution, or a public system of
higher education; or

(B)    a local educational agency (as defined in section 7801 of Title 20), system of
career and technical education, or other school system;

(3) (A)    an entire corporation, partnership, or other private organization, or an entire sole
proprietorship—

(i)  if assistance is extended to such corporation, partnership, private organization,
or sole proprietorship as a whole; or

(ii) which is principally engaged in the business of providing education, health
care, housing, social services, or parks and recreation; or

(B)    the entire plant or other comparable, geographically separate facility to which
Federal financial assistance is extended, in the case of any other corporation,
partnership, private organization, or sole proprietorship; or

13

(4)    any other entity which is established by two or more of the entities described in paragraph (1), (2), or (3); any part of which is extended Federal financial assistance.

29 U.S.C. § 794(b).  The ADA does not require that public entities provide "services of a personal nature[,] including assistance in eating, toileting, or dressing."  28 C.F.R. § 35.135. However, those states that do elect to offer such services must provide them "in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).  This implementing regulation of the ADA is commonly referred to as the "integration mandate."  See, e.g., Pashby v. Delia, 709 F.3d 307 (4th Cir. 2013).

An analogous provision exists for the Rehabilitation Act and requires recipients of federal funds to "administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons."  28 C.F.R. § 41.51(d).  Because both the ADA and Section 504 impose the same integration requirements, the court will consider both of these claims together.  Pashby v. Delia, 709 F.3d 307, 321(4th Cir. 2013) ("We consider their Title II and Section 504 claims together because these provisions impose the same integration requirements.").

To establish an ADA/Section 504 claim, a plaintiff must show that: (1) he has a disability; (2) he is "otherwise qualified to receive the benefits of a public service, program, or activity;" and (3) he was "denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of [the] disability."  Nat'l Fed. of the Blind v. Lamone, 813 F.3d 494, 502-03 (4th Cir. 2016).  Further, a "plaintiff[] must propose a reasonable modification to the challenged public program that will allow [] the meaningful access they seek."  Id. at 507;

14

see also 28 C.F.R. § 35.130(b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability. . . .")  "A modification is reasonable if it is 'reasonable on its face' or used 'ordinarily or in the run of cases' and will not cause 'undue hardship.'" Id. (citing Halpern, 669 F.3d at 464.

"To establish a prima facie retaliation claim under the ADA, plaintiffs must [show] (1) that they engaged in protected conduct, (2) that they suffered an adverse action, and (3) that a causal link exists between the protected conduct and the adverse action." A Soc'y Without a Name v. Virginia, 655 F.3d 342, 350 (4th Cir. 2011).

### 2. Violation of Constitutional Rights

Title 42, United States Code, Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

"To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law." Mills v. Greenville Cnty., 586 F. Supp. 2d 480, 485 (D.S.C. 2008) (citing West v. Atkins, 487 U.S. 42, 48 (1988)).  To establish supervisory liability under § 1983, a plaintiff must show:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit

authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted).

### 3. State Law Civil Conspiracy

Under South Carolina law, "a plaintiff asserting a civil conspiracy claim must establish (1) the combination or agreement of two or more persons, (2) to commit an unlawful act or a lawful act by unlawful means, (3) together with the commission of an overt act in furtherance of the agreement, and (4) damages proximately resulting to the plaintiff." Paradis v. Charleston Cty. Sch. Dist., 861 S.E.2d 774, 780 (S.C. 2021). "The gravamen of the tort of civil conspiracy is the damage resulting to the plaintiff from an overt act done pursuant to a common design." Cricket Cove Ventures, LLC v. Gilland, 701 S.E.2d 39, 46 (S.C. Ct. App. 2010) (citing Vaught v. Waites, 387 S.E.2d 91, 95 (S.C. Ct. App. 1989) (overruled on other grounds by Paradis, 861 S.E.2d at 779)).

### 4. State Law Gross Negligence

"Gross negligence is defined as 'the failure to exercise slight care.'" Doe v. Greenville Cnty. School Dist., 651 S.E.2d 305, 309 (S.C. 2007) (quoting Steinke v. South Carolina Dep't of Labor, Licensing and Regulation, 520 S.E.2d 142, 153 (S.C. 1999)). "It has also been defined as the intentional, conscious failure to do something which it is incumbent upon one to do or the doing of a thing intentionally that one ought not to do." Id. (internal quotation marks omitted). Gross negligence "is the absence of care that is necessary under the circumstances." Id.

### 5. Unjust Enrichment

"Unjust enrichment is an equitable doctrine which permits the recovery of that amount

the defendant has been unjustly enriched at the expense of the plaintiff. " Dema v. Tenet

Physician Servs.-Hilton Head, Inc., 678 S.E.2d 430, 434 (S.C. 2010). One seeking recovery for

unjust enrichment must show "(1) a benefit conferred upon the defendant by the plaintiff; (2)

realization of that benefit by the defendant; and (3) retention by the defendant of the benefit

under conditions that make it unjust for him to retain it without paying its value." Columbia

Wholesale Co. v. Scudder May N.V., 440 S.E.2d 129, 130 (S.C. 1994). "The remedy for unjust

enrichment is restitution." Inglese v. Beal, 403 S.E.2d 687 (S.C. Ct. App. 2013) (citing Sauner

v. Pub. Serv. Auth. of S.C., 581 S.E.2d 161, 167 (S.C. 2003).

### C. Motions to Dismiss

### 1. Defendant Governor McMaster's Motion to Dismiss, ECF No. 42

Governor McMaster has moved to dismiss all claims against him, both in his individual

and official capacities.[8] (Mem. Supp. Mot. Dismiss 1-2, 4, ECF No. 42.)

---

[8] In paragraph 6 of the amended complaint, Plaintiffs state that Governor McMaster "is sued in his official capacity and his individual capacity." (Am. Compl. ¶ 6, ECF No. 32.) However, in the portion of the amended complaint setting forth Plaintiffs' specific allegation in support of the ADA and Section 504 causes of action, Plaintiffs state that Governor McMaster is sued "in his official capacity as Governor of the State of South Carolina." (Id. ¶140, ECF No. 32.). Further, since Plaintiffs have voluntarily dismissed the remaining claims against Governor McMaster as set forth more fully below, the court construes the amended complaint as only asserting ADA and Section 504 claims against Governor McMaster in his official capacity. See (Resp. Opp'n 11, ECF No. 47.) Further, Plaintiffs failed to respond to Governor McMaster's argument that these claims are redundant, or duplicative, to those asserted against the other agencies in this action. Thus, Plaintiffs have effectively conceded this point. Ferdinand-Davenport v. Children's Guild, 742 F. Supp. 2d 772, 777 (D. Md. 2010) (by failing to respond to defendant's argument with respect to discriminatory discharge claim, plaintiff abandoned her claim); Stenlund v. Marriott Int'l, Inc., 172 F. Supp. 3d 874, 887 (D. Md. 2016) ("In failing to respond to [defendant's] argument, Plaintiff concedes the point."); Brand v. N.C.

### a. ADA/Section 504 Claim

Plaintiffs allege in the amended complaint that "governmental officials and entities may be sued for monetary damages in their official capacities for violations of the ADA and the Rehabilitation Act."  (Am. Compl. ¶ 141, ECF No. 32. )  Governor McMaster asserts that Plaintiffs have failed to state a claim upon which relief can be granted because: (1) he is not a program or activity under the Rehabilitation Act; (2) these claims against him are redundant because Plaintiffs have also sued the individual agencies; and (3) Plaintiffs' theory of this case has been rejected in previous cases.  (Mem. Supp. Mot. Dismiss 8-9, ECF No. 42; Reply 3, ECF No. 51.)

The court finds that any claims brought against Governor McMaster in his official capacity as South Carolina Governor are duplicative of those alleged against the Office of the Governor.  See Love-Lane v. Martin, 355 F.3d 766, 783 (4th Cir. 2004) (holding that the district court correctly dismissed plaintiff's claims against public officials in their official capacities as duplicative); see also Est. of Valentine by & through Grate v. South Carolina, C/A No. 3:18-00895-JFA, 2019 WL 8324709, at *8 (D.S.C. Aug. 6, 2019) ("[T]he ADA and § 504 Rehabilitation Act claims [against Joshua Baker, the agency head of SCDHHS] are duplicative of the claims against SCDHHS.  Any judgment rendered against Baker in his official capacity as director of SCDHHS would be tantamount to a judgment against SCDHHS itself.

---

Dep't of Crime Control & Pub. Safety, 352 F. Supp. 2d 606, 618 (M.D.N.C. 2004); Campbell v. Rite Aid Corp., No. 7:13-CV-02638-BHH, 2014 WL 3868008, at *2 (D.S.C. Aug. 5, 2014) (unpublished) ("Plaintiff failed to respond to [defendant's]  argument regarding causes of action 1 and 2, and the Court can only assume that Plaintiff concedes the argument.").

Thus, the Court dismisses the ADA and Section 504 claims against Defendant Baker in his official capacity.").  Accordingly, these claims are dismissed.

### b. Section 1983 and Civil Conspiracy Claims

In their response to Governor McMaster's motion to dismiss, Plaintiffs have requested "to file a third amended complaint to omit Defendant McMaster as a Defendant in the Second (Section 1983) and Third (Civil Conspiracy) Causes of Action."  (Resp. Opp'n 11, ECF No 47.)  The court construes this statement as voluntarily dismissing these claims pursuant to Rule 41 of the Federal Rules of Civil Procedure.  Accordingly, these claims are dismissed.

### 2. Defendants SRHCS, UMC, Dr. Washington, and Bradley (collectively, the "SRHS Defendants") Motion to Dismiss, ECF No. 41[9]

The SRHS Defendants assert that the amended complaint should be dismissed because: (a) Plaintiffs failed to comply with the court's opinion and order, ECF No. 27, by failing to clarify the claims against each Defendant and the basis for each, (b) the SRHS Defendants had no lawful authority to make placement decisions for Matthew, (c) the civil conspiracy and gross negligence claims are barred by the statute of limitations, (d) Plaintiffs failed to comply with the South Carolina Medical Malpractice presuit requirements, and (e) the civil conspiracy and gross negligence claims are barred by the South Carolina Tort Claims Act because they are asserted against South Carolina employees.  (Mem. Supp. Mot. Dismiss 2, ECF No. 41.)

---

[9] The amended complaint appears to be asserting a § 1983 claim against the SRHS Defendants.  See (Am. Compl. ¶ 162, 167, ECF No. 32.)  However, the SRHS Defendants have not moved to dismiss this claim, and the court will not address it herein.

**a. Failure to Comply with Court Order**

In the court's October 6, 2021, Opinion and Order, Plaintiffs were directed to file an amended complaint and to "plainly state in the first paragraph the specific defendants against whom that cause of action is asserted." (Opinion & Order, ECF No. 27.) Plaintiffs failed to fully comply with this directive. As a result, Plaintiffs have made the task of evaluating and responding to their claims unnecessarily difficult. Further, Plaintiffs' failures have saddled the court with attempting to divine against whom Plaintiffs are alleging claims. Plaintiffs' counsel is admonished that the continued failure to follow the court's orders may result in the involuntary dismissal of this action. See Fed. R. Civ P. 41(b) ("If the plaintiff fails . . . to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it."). However, the court is constrained to deny the SRHS Defendants' motion to dismiss on this basis at this time.

**b. ADA/Section 504 Cause of Action - SRHCS and UMC**

SRHCS and UMC argue the ADA/Section 504 cause of action should be dismissed because they "had no lawful authority to make placement decisions for Matthew . . . ," therefore, they were not in a position to deny benefits or otherwise discriminate against him. (Mem. Supp Mot. Dismiss 9, ECF No. 41.) SRHCS and UMC assert that the South Carolina Adult Health Care Consent Act lists ten categories[10] of persons who are authorized to make placement

---

[10] This list includes: (1) a guardian appointed by the court; (2) an attorney-in-fact appointed by the patient in a durable power of attorney; (3) a spouse of the patient; (4) an adult child of the patient; (5) a parent of the patient; (6) an adult sibling of the patient; (7) a grandparent of the patient; (8) any other adult relative by blood or marriage with a close personal relationship to the patient; (9) a person given authority to make healthcare decisions for the patient by another statutory provision; and (10) a person who has an established relationship with the patient. S.C. Code Ann. § 44-66-30(A).

decisions, and SRHCS and UMC, as acute health care hospitals, are not included in these categories. See S.C. Code Ann § 44-66-30(A). Further, the South Carolina Adult Health Care Consent Act forbids "a provider of health care services to the patient" from being a decision-maker. Id. § 44-66-30(A)(10). Therefore, the authority to determine and provide services in the least restrictive environment did not lie with the SRHS Defendants. Further, to the contrary, Plaintiffs affirmatively allege that DSS and DDSN had authority to determine and provide services to Matthew. (Am. Compl. ¶ 81, ECF No. 32); (Resp. Opp'n 4, ECF No. 48); S.C. Code Ann § 44-20-390(B) (requiring DDSN to develop a service plan for individuals under their care with an intellectual disability and "to review service plans . . . to ensure that appropriate services are being provided in the least restrictive environment available.").

In their response, Plaintiffs argue that, despite this statutory scheme and SRHCS' lack of decision-making authority, SRHS Defendants "ignore[] the fact that they unreasonably failed to provide him the liberties that even prisoners are granted . . . ." (Resp. Opp'n 3, ECF 46.) Plaintiffs also argue that SRHCS and UMC "arranged for Matthew to be transported to Laurens to visit Clinton Manor, but refused to [allow Matthew to] leave the hospital to attend school." (Resp. Opp'n 4, ECF No. 46.)[11] Further, Plaintiffs emphasize that they alleged that "[t]hese Defendants intentionally and with conscious indifference violated Title II of the Americans

_____

[11] Plaintiffs also appear to argue, for the first time, in their response in opposition to the SRHS Defendants' motion to dismiss, that Matthew actually was transported to Clinton Manor. (Resp. Opp'n 4, ECF No. 46) ("After secretly transporting Matthew to Clinton Manor, without notice to his parents, as alleged in Paragraph 93 [of the amended complaint] . . . .") Paragraph 93 states as follows: "[t]hese Defendants schemed to sedate and chemically restrain Matthew **in preparation** for the transfer to Clinton . . . ." (Am. Compl. ¶ 93, ECF No. 32) (emphasis added). Nowhere in the amended complaint do Plaintiffs allege that Matthew was ever actually transported to Clinton Manor. To the contrary, Plaintiffs explicitly state that the transfer never occurred. (Id. ¶ 108, ECF No. 32) ("[A] state senator . . . halted the illegal transfer . . . .")

21

[w]ith Disabilities Act . . . and Section 504 of the Rehabilitation Act . . .[,] and Plaintiffs' rights protected by the Fourteenth Amendment. They 'intentionally and with conscious indifference to Matthew's and [Parkins'] rights,' refused to provide less restrictive services." (Resp. Opp'n 4, ECF No. 46.)

Pleadings that contain mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. Plaintiffs have failed to meet this "plausibility standard," as it requires "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678. Further, Plaintiffs' repeated ambiguous allegations against "these defendants," in this cause of action against at least eleven defendants, fail to articulate a plausible claim against SRHCS and UMC.

The court finds that Plaintiffs have failed to set forth specific, plausible allegations that SRHCS and UMC had any involvement in making placement decisions or that any medical services provided to Matthew were more restrictive than an acute care hospital provides in the same or similar circumstances. Plaintiffs' vague allegations against the SRHS Defendants stand in direct contrast to Plaintiffs' detailed allegations describing the placement decisions made by DSS. See e.g. (Am. Compl. ¶ 38 ECF No. 32) ("Means [of DSS] refused to allow Matt to see Matthew."); (Id. ¶ 46, ECF No. 32) ("Means directed that Matthew be secluded in his room, with sitters bedside who were instructed not to allow Matthew to get out of the bed for any purpose.") Further, Plaintiffs have alleged that DDSN "was responsible for determining placement of all DDSN clients . . . ." (Id. ¶ 81, ECF No. 32) The amended complaint wholly fails to set forth any specific allegations that the SRHS Defendants "denied the benefits of [any] public service, program, or activity, or otherwise discriminated against [Matthew], on the basis

of [his] disability." <u>Lamone</u>, 813 F.3d at 502-03.  Based on the foregoing, this claim is dismissed.

### c. Statute of Limitations for the State Civil Conspiracy and Gross Negligence Causes of Action - Dr. Washington, UMC, and any "Roe" UMC Employees

The SRHS Defendants argue that Plaintiffs' state civil conspiracy and gross negligence claims are time barred by the two-year statute of limitations contained in the South Carolina Tort Claims Act ("SCTCA").  <u>See</u> S.C. Code Ann. § 15-78-110 ("[A]ny action brought pursuant to this chapter is forever barred unless an action is commenced within two years . . . ."); (Mem. Supp. Mot. Dismiss 11, ECF No. 41.)  The SCTCA provides "the exclusive civil remedy available for any tort committed by a governmental entity, its employees, or its agents . . . ." S.C. Code Ann. § 15-78-20(b).  "[A]n action for damages under the [SCTCA] may be instituted at any time within two years after the loss was or should have been discovered" unless a verified claim for damages was filed with the State.  <u>Id.</u> § 15-78-100.  If a verified "claim for damages was filed and disallowed or rejected an action for damages filed under this chapter, based upon the same occurrence as the claim, may be instituted within three years after the loss was or should have been discovered."  <u>Id.</u> § 15-78-100.  However, there is a longer statute of limitations for "persons under [a] disability."  <u>Id.</u> § 15-3-40.

> If a person entitled to bring an action [under the SCTCA] . . . , is at the time the cause of action accrued either:
>
> (1) within the age of eighteen years; or
> (2) insane;
>
> the time of the disability is not a part of the time limited for the commencement of the action, except that the period within which the action must be brought cannot be extended:
>
> (a) more than five years by any such disability, except infancy; nor
> (b) in any case longer than one year after the disability ceases.

S.C. Code Ann. § 15-3-40.  Plaintiffs filed the initial complaint on April 15, 2021, and alleged that the course of conduct giving rise to this action occurred between April 16, 2018 and May 23, 2018.  (Not. Removal Ex. 1 (State Court Documents), ECF No. 1-1); (Am. Compl. ¶¶ 35-120, ECF No. 32.)

As to Matthew, the court finds that the provision contained in S.C. Code Ann. § 15-3-40, which extends the statute of limitations to seven years, is applicable because it is undisputed that he is mentally incompetent.  Wiggins v. Edwards, 442 S.E.2d 169, 170 (S.C. 1994) ("Insanity or mental incompetency that tolls the statute of limitations consists of a mental condition which precludes understanding the nature or effects or one's acts, an incapacity to manage one's affairs, an inability to understand or protect one's rights, because of an over-all inability to function in society, or the mental condition is such as to require care in a hospital.") Accordingly, the court denies this portion of the motion to dismiss.

As to Parkins, the court finds that the two-year statute of limitations contained in S.C. Code Ann. § 15-78-110 is applicable because he does not qualify as "insane" under S.C. Code Ann. § 15-3-40.  Further, there is no dispute that Plaintiffs did not file a "verified claim for damages" which would extend the statute of limitations to three-years.  See S.C. Code Ann. §§15-78-100(a), 15-78-80.  Accordingly, Parkins' claims for civil conspiracy and gross negligence are time barred.  Thus, the court grants this portion of the motion and dismisses Parkins' third and fourth causes of action against the SRHS defendants.

In addition, the SRHS Defendants argue that Plaintiffs' civil conspiracy and gross negligence claims asserted against Dr. Washington and any John Roe and Jane Roe defendants

24

are barred by the SCTCA because they are state employees.[12]  (Mem. Supp. Mot. Dismiss 13-14, ECF No. 41.)  Under the SCTCA, a "governmental entity is not liable for a loss resulting from: . . . responsibility or duty including but not limited to supervision, protection, control, confinement, or custody of any student, patient, prisoner, inmate, or client of any governmental entity, except when the responsibility or duty is exercised in a grossly negligent manner."  S.C. Code Ann. § 15-78-60(25)   "Employee" means "any officer, employee, agent, or court appointed representative of the State or its political subdivisions, including elected or appointed officials, law enforcement officers, and persons acting on behalf or in service of a governmental entity in the scope of official duty . . . ."  S.C. Code Ann. § 15-78-30(c).  An employee of a governmental entity is not liable for his actions individually or independently from his governmental employer when acting within the scope of his official duty.  Id. § 15-78-70(a).

The SCTCA contains an exception to this limitation on liability if the "employee conduct [occurred] outside the scope of his official duties or [the conduct] constitutes actual fraud, actual malice, intent to harm, or a crime involving moral turpitude."  Id. § 15-78-60(17).  "Scope of official duty" or "scope of state employment" is defined as "(1) acting in and about the official business of a governmental entity and (2) performing official duties."  Id. § 15-78-30(I).  "The provisions . . . establishing limitations on and exemptions to the liability of the State, its political subdivisions, and employees, while acting within the scope of official duty, must be liberally construed in favor of limiting the liability of the State."  Id. § 15–78–20(f); see also

_____

[12] It is undisputed that SRHCS and UMC are government entities and that Dr. Washington is an employee of a public entity.

Wade v. Berkeley Cnty., 498 S.E.2d 684 (S.C. Ct. App. 1998) (noting that section 15-78-20(f) limits coverage to employees acting within the scope of official duty).

With respect to their civil conspiracy and gross negligence claims against Dr. Washington and the "Roe" Defendants, Plaintiffs have alleged that "[t]he actions of Washington . . . were willful, hostile[,] and outrageous and were outside the scope of their duties and [] in complete disregard for Plaintiffs' rights." (Am. Compl. ¶ 208, ECF No. 32); (Id. ¶ 200, ECF No. 32) ("[T]hey were able to inflict their evil agenda upon Plaintiffs and did so outside the scope of their own employment in an intentional and malicious manner . . . ."). Further, Plaintiffs allege that Defendants Baker, Kerr, Myers, Maley, Hill, Means, Dr. Washington, and Bradley conspired to "illegally force Matthew into Clinton Manor without a court order," and "schemed to chemically restrain Matthew for the convenience of staff and restricted visitation with his family in order to isolate and seclude him until their mission of incarcerating him at Clinton Manor was accomplished." (Id. ¶¶ 196-198, ECF No. 32.) Plaintiffs allege that any "Roe" Defendants also participated in the conspiracy to institutionalize Matthew. (Id. ¶ 22, ECF No. 32.) However, as Plaintiffs admit, Matthew was released from UMC to his family and was not transferred to Clinton Manor. (Id. ¶ 113, ECF No. 32.)

The amended complaint alleges torts committed by Dr. Washington while acting within the scope of her official duty as a physician. See (Id. ¶¶ 62-65, 67, 77, 93, ECF No. 32.) However, the court finds that any conclusory allegation that Dr. Washington, as a physician, was acting outside the scope of her official duties to further some "evil agenda" while providing medical treatment to Matthew to be implausible. (Am. Compl. ¶ 200, ECF No. 32.) There are

26

no allegations asserted against Dr. Washington that could plausibly be read as asserting conduct outside the scope of her official duties.  Accordingly, the court finds S.C. Code Ann. § 15-78-70(a) applicable and dismisses Plaintiffs' civil conspiracy and gross negligence causes of action as to Dr. Washington.

Further, Plaintiffs failed to respond to SRHS Defendants' argument that any UMC "Roe" employees were acting within the scope of their employment.  Therefore, Plaintiffs have conceded these arguments.  Accordingly, the civil conspiracy and gross negligence claims are also dismissed as to any "Roe" Defendants.

### d. Civil Conspiracy, Gross Negligence, and Unjust Enrichment - SRHCS, UMC, Jan Bradley

The SRHS Defendants also argue that Plaintiffs' civil conspiracy, gross negligence, and unjust enrichment causes of action sound in medical malpractice and should therefore be dismissed because Plaintiffs failed to comply with the medical malpractice presuit requirements contained in S.C. Code Ann. §§ 15-79-125 and 15-36-100.  (Mot. Dismiss 15, ECF No. 41.) In addition, as an alternative basis for dismissal, the SRHS Defendants also argue that Plaintiffs' civil conspiracy cause of action should be dismissed "[b]ecause [n]o [d]amages were [c]aused to Plaintiffs as a [r]esult of the [a]lleged [u]nlawful [a]cts."  (Id. 14, ECF No. 41.)

### i. Medical Negligence Claim

Plaintiffs allege that UMC, DDSN, and DHHS, were grossly negligent by

> failing to contact Matthew's treating physicians during the investigation and in the process of admitting Matthew to Clinton Manor, failing to comply with applicable state and federal standards of care[,] and failing to obtain a PASARR[13] and to determine whether institutionalization could be avoided by providing specialized services; diverting funds allocated to provide in-home services for other, unauthorized purposes and filing inflated cost reports with the federal government; and failing to comply with S.C. Code of Laws Ann. 44-20-450, which required due process and a court order to involuntarily admit Matthew to Clinton Manor.

(Am. Compl. ¶ 205, ECF No. 32.)  Further, Plaintiffs allege that Jan Bradley and Dr. Washington, "were grossly negligent and violated applicable standards of care of their **professions** in the treatment provided at UMC."[14]  (Id. ¶ 206, ECF No. 32.) (emphasis added). With respect to civil conspiracy, Plaintiffs allege that Defendants Baker, Kerr, Myers, Maley, Hill, Means, Dr. Washington, and Bradley conspired to "illegally force Matthew into Clinton Manor without a court order," and "schemed to chemically restrain Matthew for the convenience of staff[,] and restricted visitation with his family in order to isolate and seclude him until their mission of incarcerating him at Clinton Manor was accomplished."  (Id. ¶¶ 197-198, ECF No. 32.)

---

[13] A PASARR is a Preadmission Screening and Resident Review that is "conducted by DHHS." (Am. Compl. ¶ 56, ECF No. 32.)  It is a program operated pursuant to federal law "which requires preadmission screening of all individuals with mental illness or 'mental retardation' (intellectual disabilities)."  (Id. n.2, ECF No. 32.)  Plaintiffs allege that "[t]he purpose of this screening is to prevent institutionalization and to determine whether specialized services could prevent institutionalization."  (Id., ECF No. 32.)

[14] The SRHS Defendants assert, and the Plaintiffs have not alleged or argued otherwise, that Jan Bradley is not an employee of SRHCS or UMC.  (Reply 6, ECF No. 54.)

As an initial matter, Plaintiffs have asserted factual allegations that are misleading because Matthew was never admitted or even transported to Clinton Manor. Further, Plaintiffs' allegations of misappropriation of funds with respect to in-home services, obtaining a PASSAR, filing inflated cost reports, and decisions regarding institutionalization of Matthew at Clinton Manor do not plausibly involve any of the SRHS Defendants.

Plaintiffs argue in opposition that the claims against the SRHS Defendants are not subject to the presuit requirements because the SCTCA is the sole remedy for actions against governmental entities, hence the presuit requirements applicable to medical negligence claims are inapplicable. (Resp. Opp'n 7-15, ECF No. 46.) Additionally, Plaintiffs argue that the following allegations in the amended complaint raise ordinary negligence claims, as opposed to medical negligence; thus, no expert testimony is needed:

> 85. In preparation for this illegal transfer, Defendants sedated Matthew, secluded him in the hospital room, restrained him from getting out of bed and prevented him from freely communicating and visiting with his family, friends and his treatment team.
>
> 86. Matthew was left nearly naked in a hospital bed during this thirty-three day confinement, dressed only in a short-sleeved t-shirt and a diaper for the convenience of staff, with his pubic hairs visible to persons passing by his door.
>
> 99. Means, Washington, Bradley, Maley and employees of the DHHS, DDSN, UMC and the LCDSNB Board made final arrangements to transfer Matthew to Clinton Manor on Friday, May 11, "or at the latest, Monday, May 14"- without initiating involuntary commitment proceedings in the probate or family court, prior to a Guardian Ad Litem being appointed in the pending DSS proceedings.

(Resp. Opp'n 15, ECF No. 46); (Am. Compl. ¶¶ 85-86, 99, ECF No. 32.) As an initial matter, it is unclear to which Defendants paragraph 85 refers. Clearly, the decision whether to administer medication to sedate a patient is alleging negligent medical care and would require expert testimony. Dawkins v. Union Hosp. Dist., 758 S.E.2d 501, 505 (S.C. 2014)

("While providing medical services to a patient, the medical professional acts in his professional capacity and must meet the professional standard of care, as established by expert testimony.").

Additionally, Plaintiffs have alleged that Matthew, a severely disabled man, requires a wheelchair for locomotion, and otherwise can only move about by "crawling or 'scooting' on the floor . . . ."  (Id. ¶ 34, ECF No. 32.)  Accordingly, the decision to restrain Matthew was part of his medical treatment, which required clinical judgment.  See S.C. Code Ann. § 15-79-110(6) ("Medical malpractice" is defined as "doing that which the reasonably prudent health care provider or health care institution would not do or not doing that which the reasonably prudent health care provider or health care institution would do in the same or similar circumstances.").  Further, Plaintiffs alleged earlier in the complaint that Means "directed that Matthew be secluded in his room, with sitters bedside who were instructed not to allow Matthew to get out of the bed for any purpose," and "prohibited any family member from visiting Matthew . . . ."  (Am. Compl. ¶¶ 46, 59, ECF No. 32.)  Accordingly, this allegation is not attributable to the SRHS Defendants.

With respect to paragraph 86, this alleged conduct asserts, at most, negligence, and does not rise to the level of gross negligence.  To the extent that paragraph 99 can even be construed as applying to actions taken by the SRHS Defendants, this conduct relates to medical care.  Further, as previously discussed, the South Carolina Adult Health Care Consent Act forbids "a provider of health care services to the patient" from being a decision-maker with respect to placement decisions.  Id. § 44-66-30(A)(10).

Plaintiffs fail to assert any specific allegations with respect to their gross negligence, civil conspiracy, and unjust enrichment claims that any SRHS Defendants' agent or employee

30

undertook any actions which were not related to or directly involving the care and medical treatment of Matthew.  In fact, with respect to Plaintiffs' unjust enrichment claim, Plaintiffs argue in their response in opposition that this claim is based on the premise that "these defendants should not be allowed to retain payment for the grossly negligent services provided." (Resp. Opp'n 15, ECF No. 46) (emphasis added).

Upon review of the amended complaint, at best, Plaintiffs are attempting to assert a claim alleging grossly negligent medical care against the SRHS Defendants.  See Dawkins, 758 S.E.2d at 504 (explaining that if the patient is "[alleging] negligent professional medical care, then expert testimony as to the standard of that type of care is necessary," but if the patient receives "nonmedical, administrative, ministerial, or routine care," expert testimony is not required because the action sounds in ordinary negligence).

### ii. Government Health Care Facilities

Plaintiffs also argue that the South Carolina Noneconomic Damages Awards Act ("SCNDAA"), limiting recovery for noneconomic damages in medical malpractice actions, does not include "Government Health Care Facilities" in its definitions; therefore, the presuit requirements do not apply to them.  (Resp. Opp'n 9-10, ECF No. 46.)  As discussed more fully below, this contention is without merit because the presuit provisions supplement those contained in the SCTCA.  Further, although the SCNDAA does not include a specific definition for "Government Health Care Facilities," it does include broad definitions for "Health care institution," "Health care provider," and "Hospital."  S.C. Code Ann. § 15-32-210(4)-(6).  These terms are intentionally broad because the SCNDAA, unlike the SCTCA, applies to both public and private entities.

31

### iii. Presuit Requirements to Filing a Medical Malpractice Claim

Before filing a medical malpractice lawsuit in South Carolina, a plaintiff must comply

with several mandatory pleading and presuit requirements.  A plaintiff must "file a Notice of

Intent to File Suit and an affidavit of an expert witness," and must participate in presuit

mediation.  S.C. Code Ann. § 15-79-125.  These requirements were enacted in order to "provide

an informal and expedient method of culling prospective medical malpractice cases by fostering

the settlement of potentially meritorious claims and discouraging the filing of frivolous claims."

Ross v. Waccamaw Cmty. Hosp., 744 S.E.2d 547, 550 (S.C. 2013).  If these requirements are

met and the lawsuit is filed, a plaintiff must then file "an affidavit of an expert witness which

must specify at least one negligent act or omission claimed to exist and the factual basis for each

claim . . . ."  S.C. Code Ann. § 15-36-100(B).  "Medical doctors" are listed as one of the

professions to which the section applies.  Id. § 15-36-100(G)(7).  "Medical malpractice" is

defined as "doing that which the reasonably prudent health care provider or health care

institution would not do or not doing that which the reasonably prudent health care provider or

health care institution would do in the same or similar circumstances."  Id. § 15-79-110(6).  "If a

claim fails to satisfy these requirements and does not fall into an applicable exception, it must be

dismissed for failure to state a claim."  Duckett v. SCP 2006-C23-202, LLC, 225 F. Supp. 3d

432, 437 (D.S.C. 2015).

Plaintiffs concede that these provisions were not satisfied, but contend that these presuit

requirements do not apply to claims against governmental entities covered under the SCTCA.

(Resp. Opp'n 7-8, ECF No. 46.)  The parties have not cited any precedential case law

considering the exact issue raised in this action: whether a plaintiff is required to comply with

the statutory presuit requirements of Sections 15-36-100 and/or 15-79-125 when asserting a

gross medical negligence cause of action against a government medical institution and physician

employee covered under the SCTCA.[15]

In Ranucci v. Crain, the South Carolina Supreme Court analyzed the notice of intent to

file suit requirements in section 15-79-125(A) and the expert affidavit requirements in section

15-36-100 to determine whether the notice of intent to file suit requirement extended the time to

file the expert witness affidavit.  763 S.E.2d 189 (S.C. 2014).  The court held that it did and

concluded that "the General Assembly sought to promote tort reform by creating a more

efficient process in resolving **all professional negligence** cases by enacting 15-36-100."

Ranucci, 763 S.E.2d at 193 (emphasis added)

In addition, the SCTCA contains the following provision: "[t]he State, an agency, a

political subdivision, and a governmental entity are liable for their torts **in the same manner**

and to the same extent as a private individual under like circumstances . . . ."  S.C. Code Ann.

§ 15-78-40 (emphasis added).  Section 15–78–50(b) provides, "[i]n no case is a governmental

entity liable for a tort of an employee where that employee, if a private person, would not be

liable under the laws of this State."  Further, section 15-78-220 of the SCTCA provides that

"[t]he provision of Act 32 of 2005 [which includes the presuit requirements] do not affect any

right, privilege, or provision of the [SCTCA] . . . ."  S.C. Code Ann. §15-78-220.  "Accordingly,

the Legislature clearly intended to limit government liability through the Tort Claims Act, and at

_____

[15] The court denies Plaintiffs' request to certify this issue to the South Carolina Supreme
Court.  (Resp. Opp'n 15, ECF No. 46.)  In addition, the court finds that a hearing would not
assist the court in considering this issue.

no time did the Legislature intend government liability to exceed that of a private entity." Kerr v. Richland Mem'l Hosp., 678 S.E.2d 809, 810 (S.C. 2009). In Kerr, although not specifically dealing with the presuit requirements, the South Carolina Supreme Court concluded that the medical malpractice statute of repose, set forth in S.C. Code Ann. § 15-3-545(A), applies to actions against government entities under the SCTCA. 678 S.E.2d at 810. The court reasoned that to find otherwise would result in government entity liability exceeding that of a private entity. Id. at 811. Likewise, to exempt medical malpractice cases under the SCTCA from the presuit requirements would in effect expand government liability through the SCTCA, which is contrary to the legislative intent of the SCTCA.

Further, the South Carolina Court of Appeals noted, in Bennett v. Lexington Cnty. Health Servs. Dist., Inc., No. 2015-UP-305, 2015 WL 3884262, at * 3 (S.C. Ct. App. Jun. 24, 2015) (unpublished), that compliance with the medical malpractice presuit requirements was required in a case covered by the SCTCA, finding that the plaintiff had sufficient time "to obtain the requisite physician affidavit before filing suit" in order to comply with the SCTCA's statute of limitations.[16]

In addition, other federal district courts within the District of South Carolina have considered the South Carolina presuit requirements in the context of professional medical negligence claims under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, et seq.

---

[16] Plaintiffs cite Grubb v. Clarendon Mem'l Hosp., C/A 2009-CP-14-439 (S.C. Court of Common Pleas Aug. 31, 2011), an unpublished state trial court decision, to support their position. The court finds that case distinguishable and declines to follow its reasoning. Further, that case was decided prior to several of the cases cited above.

See Delaney v. United States, 260 F. Supp. 3d 505, 510 (D.S.C. 2017) (finding that "a medical malpractice claim masquerading as an ordinary negligence claim" was subject to the presuit requirements in an action brought under the Federal Tort Claims Act); Chappie v. United States, No. 8:13-CV-1790-RMG, 2014 WL 3615384, at *1 (D.S.C. July 21, 2014), aff'd, 585 F. App'x 113 (4th Cir. 2014) ("Defendant is entitled to summary judgment on Plaintiff's claim under the Federal Tort Claims Act for medical negligence because Plaintiff has not complied with South Carolina's expert affidavit requirement, S.C. Code §§ 15-36-100 and 15-79-125.")

    The court finds the FTCA cases requiring compliance with the medical negligence presuit requirements persuasive.  Like the SCTCA, the FTCA contains a limited waiver of the government's sovereign immunity, and provides that "[t]he remedy against the United States [under the FTCA] for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is exclusive of any other civil action . . . ." 28 U.S.C. § 2679(b)(1), accord S.C. Code Ann. § 15-78-200 ("[The SCTCA] is the exclusive and **sole remedy** for any tort committed by an employee of a government entity while acting within the scope of the employee's official duty." (emphasis added)).  In addition, like the SCTCA, the FTCA requires a plaintiff to establish the government's liability "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b); S.C. Code Ann. § 15-78-40.

    Based on the foregoing, the court finds that compliance with the presuit requirements is necessary in a medical negligence action against a government entity under the SCTCA.

Accordingly, having found that the gross negligence, civil conspiracy, and unjust enrichment claims sound in medical negligence, the court grants the SRHS Defendants' motion to dismiss the gross negligence, civil conspiracy, and unjust enrichment claims for failure to comply with the presuit requirements set forth in S.C. Code Ann. §§ 15-79-125;15-36-100(B).[17]

### iv. Jan Bradley

As to Jan Bradley, the court finds that the Plaintiffs have failed to satisfy the pleading requirements. The allegations asserted against her are conclusory and merely recite the threadbare elements of the cause of action. See, e.g., (Am. Compl. ¶ 206, ECF No. 32) ("Bradley. . . [was] grossly negligent and violated applicable standards of care of [her] profession[] in the treatment provided at UMC.") Further, there are no specific allegations about how she participated in any conspiracy. Additionally, as there is no dispute that she is not a government employee, the presuit requirements clearly apply, as Plaintiffs are alleging professional negligence relating to the care that Matthew received at UMC, and the requirements were not met. Accordingly, the civil conspiracy and gross negligence claims are dismissed.

---

[17] The claims asserted against Dr. Washington have been dismissed pursuant to S.C. Code Ann. § 15-78-70(a) because she is a state employee and Plaintiffs failed to plausibly allege that she was acting outside the scope of her official duties. However, Plaintiffs' claims against Dr. Washington for gross negligence and civil conspiracy are also subject to dismissal for failure to comply with the medical malpractice presuit requirements.

### 3. Defendants Baker (DHHS Director from 2017-2021), Kerr (Current DHHS Director), Myers (DHHS Employee), Maley (Former Interim DDSN Director from November 2017-July 2018), Fry (Current Director of DDSN), DDSN, DHHS, and LCDSNB's Motion to Dismiss, ECF No. 43

#### a. ADA/Section 504 Claim

Defendants DHHS, DDSN, LCDSNB, Kerr, in his official capacity, and Fry, in her official capacity, argue that Plaintiffs' ADA/Section 504 cause of action fails to state a claim because Matthew never resided at Clinton Manor; therefore, he suffered no harm as a result of any alleged conspiracy. Specifically, DHHS, DDSN, LCDSNB, Kerr, and Fry argue that DHHS, DDSN, and LCDSNB lacked decision-making authority over Matthew and undertook no actions adversely affecting him. (Mem. Supp. Mot. Dismiss 6-8, ECF No. 43-1.)

Plaintiffs allege in the amended complaint that DDSN, DHHS, and LCDSNB conspired with UMC and DSS "to place Matthew in the most restrictive setting in the DDSN system . . . ." (Am. Compl. ¶ 149, ECF No. 32); see also (Id. ¶ 155, ECF No. 32) ("These Defendants participated in a conspiracy to place Matthew in an ICF/ID, rather than complying with the ADA and Section 504 by providing services in his own home . . . .") As a result, Plaintiffs allege that "Matthew was chemically restrained with psychotropic drugs, he suffered physical restraints, mental and physical pain, and both he and his father experienced anxiety and fear in violation of their rights . . . ." (Id. ¶ 154, ECF No. 32.) It is further alleged that Matthew is a DDSN client, and Maley, as interim director of DDSN, is "responsible for determining the placement of DDSN clients . . . ." (Id. ¶¶ 29,178, ECF No. 32.) Finally, Plaintiffs allege that "'[t]hese Defendants' intentionally, and/or with conscious indifference to Plaintiffs' rights, retaliated against Matt and Matthew in violation of Section 503 (42 U.S.C. § 12203) of the ADA, which

prohibits retaliation against an individual who has opposed any act or practice made unlawful by the Act's anti-discrimination provisions."  (Id. ¶ 156, ECF No. 32.)

In Plaintiffs' response to the motion to dismiss, ECF No. 43-1, Plaintiffs' state that "[t]he retaliation referred to in Paragraph 156 refers to the DSS Defendants[,] and Plaintiffs, with the consent of Defendants, agree to file an amended complaint so stating."  (Resp. Opp'n 7, ECF No. 48.)  This issue is precisely why the court ordered Plaintiffs to "plainly state in the first paragraph the specific defendants against whom that cause of action is asserted."  (Opinion & Order, ECF No. 27.)  Nevertheless, this retaliation claim is dismissed.  Plaintiffs fail to assert either what protected conduct Plaintiffs engaged in or a causal link between any protected conduct and any adverse action taken by any of the Defendants.  See A Soc'y Without A Name, 655 F.3d at 350.  Therefore, Plaintiffs have plainly failed to state a claim for retaliation under the ADA, and the retaliation claim is dismissed.

Defendants DHHS, DDSN, and LCDSNB assert that the ADA/Section 504 claim fails because they were not in any way involved in "physically and chemically" restraining Matthew, nor were they involved in any placement decisions, as they had no authority to make decisions regarding Matthew's placement or treatment during the period covered by the amended complaint.  (Mem. Supp. Mot. Dismiss 6-7, ECF No. 43-1.)   To establish an ADA/Section 504 claim, a plaintiff must show that: (1) he has a disability; (2) he is "otherwise qualified to receive the benefits of a public service, program, or activity;" and (3) he was "denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of [the] disability."  Nat'l Fed. of the Blind v. Lamone, 813 F.3d 494, 502-03 (4th Cir. 2016).

It is undisputed that Matthew has a disability.  In the amended complaint, Plaintiffs alleged that Matthew was receiving care at home under the ID/RD Medicaid waiver program operated by DDSN, under contract with DHHS, prior to being admitted to the hospital. (Am. Compl. ¶ 29, ECF No. 32.)  Plaintiffs allege that while in the hospital, Matthew received care in an unnecessarily restrictive setting, and that DDSN and DHHS planned to send him to another facility that was also unnecessarily restrictive.  See e.g., (Id. ¶¶ 93, 180, ECF No. 32); (Mem. Supp. Mot. Dismiss 3, ECF 43-1.)  Plaintiffs have alleged that Matthew was eligible and qualified to receive care at home.  (Id. ¶ 155, ECF No. 32.)  Further, Plaintiffs have alleged that Matthew was denied the benefit of receiving care at home in order to divert funds to other programs.  (Id. ¶¶ 82, 157, ECF No. 32.)

As to DDSN, the Plaintiffs have sufficiently alleged that the agency, acting through its interim director, Maley, had statutory authority to make placement decisions for DDSN clients. Further, Plaintiffs allege that DDSN violated its own policies by "failing to provide notice to Matthew's family of the intent to admit Matthew. . . ."  (Id. ¶ 100, ECF No. 32.)  As to DHHS, it is alleged that they were responsible for completing the PASSAR for DDSN to use in making placement decisions, and that it failed to complete the PASSAR in a timely manner.  (Id. ¶ 56, 187, ECF No. 32.)  As to LCDSNB, Plaintiffs have alleged that it participated in the conspiracy to send Matthew to Clinton Manor.  (Am. Compl. ¶ 79, ECF No. 32.)  Based on the foregoing, the motion to dismiss is denied in regards to the ADA/Section 504 claim asserted against DDSN, DHHS, and LCDSNB.

### b. Duplicative

Defendants argue that Plaintiffs' ADA and Section 504 Rehabilitation claims against agency heads Kerr and Fry must be dismissed as duplicative because the agencies have also been named as Defendants. (Mem. Supp. Mot. Dismiss 10, ECF No. 43-1.) At the outset, Plaintiffs have not clearly identified the defendants against whom they are asserting this claim. In the amended complaint, Plaintiffs appear to list Kerr and Fry, in their official capacities, as defendants against whom they are asserting ADA and Section 504 Rehabilitation claims. (Am. Compl. ¶ 140, ECF No. 32.) However, in responding to the SRHS Defendants' argument that the complaint should be dismissed for failure to comply with the court's October 6, 2021 order, requiring the amended complaint to clearly state in the first paragraph the name(s) of the defendant(s) in each cause of action, Plaintiffs state that:

> Plaintiffs respectfully request permission to file an amended complaint to include this information below the heading of each cause of action, as such:
>
> **FIRST CAUSE OF ACTION**
>
> **Violation of the Americans with Disabilities Act and the Rehabilitation Act**
>
> **(Henry McMaster, Michael Leach, DSS, DHHS, DDSN, LCDSNB, SRHCS and UMC)**
>
> This amendment would not require the paragraph numbers to be changed.

(Resp. Opp'n 2, ECF No. 46.) Thus, Plaintiffs appear to concede any ADA and Section 504 claims against Kerr, Fry, Baker, and Maley.[18] However, Plaintiffs dedicated several pages in

---

[18] It is unclear whether Plaintiffs have attempted to assert an ADA/Section 504 claim against Baker or Maley. While Plaintiffs did not include them in their amendment above, or in paragraph 140 in the amended complaint, Plaintiff references Baker and Maley in other paragraphs under this cause of action. (Am. Compl. ¶ 152-153, ECF No. 32.)

response to the motion to dismiss filed by Kerr and Fry to the argumant that these claims against Kerr and Fry are not duplicative.  (Resp. Opp'n 7-10, ECF No. 48.)

Notwithstanding these inconsistencies, the court finds that any claims brought against Kerr, Fry, Baker, or Maley in their official capacities as directors are duplicative of those alleged against the agencies themselves.  See Love-Lane v. Martin, 355 F.3d 766, 783 (4th Cir. 2004) (holding that the district court correctly dismissed plaintiff's claims against public officials in their official capacities as duplicative); see also Est. of Valentine by & through Grate v. South Carolina, C/A 3:18-00895-JFA, 2019 WL 8324709, at *8 (D.S.C. Aug. 6, 2019) ( "[T]he ADA and § 504 Rehabilitation Act claims [against Joshua Baker, the agency head of SCDHHS] are duplicative of the claims against SCDHHS.  Any judgment rendered against Baker in his official capacity as director of SCDHHS would be tantamount to a judgment against SCDHHS itself. Thus, the Court dismisses the ADA and § 504 claims against Defendant Baker in his official capacity.").  Accordingly, these claims are dismissed.

### c. § 1983 Claims - Baker (former DHHS Director), Myers (DHHS Employee), and Maley (Interim DDSN Director)

Once again, it is exceedingly difficult to discern against whom, and in what capacity, this § 1983 claim is asserted.  See (Am. Compl. ¶164, ECF No. 32) ("Defendants Hill, Means, Baker, Myers, and Maley . . . are sued in their individual capacities. . . ."); (Id. ¶ 12, ECF No. 32) ("Joshua Baker was the director of DHHS . . . .  He is sued in his individual capacity."); (Id. ¶ 16, ECF No. 32) ("Patrick Maley was the interim director of DDSN . . . .  He is sued in his individual capacity."); but see (Id. ¶ 177, ECF No. 32) ("Washington, Bradley, Hill, Means, Maley, and Baker are sued in their official and individual capacities . . . .").

41

The court construes Plaintiffs' amended complaint as asserting a § 1983 claim against Baker, Myers, and Maley in their individual capacities.

Baker, Myers, and Maley argue that Plaintiffs failed to state a claim under § 1983 "because [the amended complaint] does not plausibly allege that any of these Defendants harmed, or were in a position to harm, Plaintiffs in the past, nor does it allege a likelihood of future harm requiring prospective relief." (Mot. Dismiss 12, ECF No. 43-1.) However, Plaintiffs have alleged that Maley and Baker conspired "to institutionalize DDSN clients so as to divert funds that had been allocated by the General Assembly and the federal government for in-home services . . . ." (Am. Compl. ¶ 82, ECF No. 32.) Plaintiffs allege that Maley, Baker, and Myers "violated Plaintiffs' right to be free from seizure by participating, either directly or indirectly, in seizing and holding Matthew in unconstitutional conditions, after the examination by P.A. [Janet Leahy] Wilson failed to reveal any evidence of intentional abuse or neglect." (Id. ¶ 167, ECF No. 32.)

In addition, it is alleged that Maley and Baker "had actual or constructive knowledge of unconstitutional conditions of confinement that posed a 'pervasive and unreasonable risk' of constitutional injury . . . ." (Id. ¶ 177, ECF No. 32.) Further, Plaintiffs allege that Maley and Baker, as agency directors, violated Plaintiffs' procedural and due process rights by failing to (1) provide Parkins with "notice of the termination of IR/RD waiver eligibility;" (2) obtain a PASSAR; (3) "comply with the notice and fair hearing requirements of the Medicaid Act;" and (4) initiate involuntary commitment proceedings before approving Matthew's transfer to Clinton Manor. (Id. ¶¶ 83, 99, 164, 191, ECF No. 32.) At a minimum, Plaintiffs have sufficiently pled "(1) that a right secured by the Constitution or laws of the United States was violated, and

(2) that the alleged violation was committed by a person acting under the color of state law."

Mills v. Greenville Cnty., 586 F. Supp. 2d 480, 485 (D.S.C. 2008) (citing West v. Atkins, 487

U.S. 42, 48 (1988)).    Accordingly, the motion is denied as to Maley and Baker.

Althea Myers is mentioned by name just three times throughout the thirty-six paragraphs

setting forth grounds for relief in this cause of action.  See (Am. Compl. ¶¶ 159-194, ECF No.

32.)  It is not enough, especially here with over twenty defendants, to simply refer to "these

defendants" when setting forth plausible allegations.  Simply put, the facts pleaded against

Myers "do not permit the court to infer more than the mere possibility of misconduct. . . ."

Iqbal, 556 U.S. at 679.  Accordingly, the §1983 claim against Myers is dismissed.

### d. Civil Conspiracy - Defendants Baker, Kerr, Myers

Plaintiffs have alleged that Baker, Kerr, and Myers, and at least five other defendants

conspired "to illegally force Matthew and other DDSN clients into the most restrictive and

expensive placements in the DDSN system. . . ."  (Am. Compl. ¶ 196, ECF No. 32.)  Plaintiffs

have further alleged that "McMaster, Baker, Kerr and Maley conspired to divert funds allocated

by the General Assembly for in-home supports for illegal purposes, forcing Matthew and others

like him into profitable ICF/ID and other congregate DDSN facilities. . . ."  (Id. ¶ 199, ECF

No. 32.)  However, Matthew was never admitted to Clinton Manor as a resident.  (Id. ¶¶ 108,

198, ECF No. 32.)  As a result, Baker, Kerr, and Myers assert that this cause of action should be

dismissed because Plaintiffs have failed to plausibly allege an essential element of the claim,

"damages proximately resulting to the plaintiff."  (Mem. Supp. Mot. Dismiss. 17, ECF

No. 43-1.)

The elements of a civil conspiracy claim are: "(1) the combination or agreement of two or more persons, (2) to commit an unlawful act or a lawful act by unlawful means, (3) together with the commission of an overt act in furtherance of the agreement, and (4) damages proximately resulting to the plaintiff." Paradis, 861 S.E.2d at 780. Plaintiffs have alleged that Baker, Maley, and Myers participated in a scheme "to illegally force Matthew . . . into the most restrictive" setting "in the DDSN system, while failing to inform families of feasible alternatives and to provide necessary in-home support[]." (Am. Compl. ¶ 196, ECF No. 32.) Further, it is alleged that "'these Defendants schemed to chemically restrain Matthew for the convenience of staff . . . in order to isolate and seclude him until their mission of incarcerating him at Clinton Manor was accomplished." (Id. ¶ 198, ECF No. 32.)

In addition, it is alleged that Myers conspired with others "to violate the rights of Matthew and [Parkins] to due process, privacy and family unity and parental control by making false allegations . . . in the DSS investigation . . . ." (Id. ¶ 197, ECF No. 32.) Although inartfully articulated, Plaintiffs appear to allege that Maley, Baker, and Myers conspired with others to cause Matthew to suffer damages due to his continued and unnecessary confinement in the hospital as a result of their improper attempt to have Matthew admitted to Clinton Manor. (Id. ¶¶ 196-99, 201, ECF No. 32.) Accordingly, the motion is denied as to the civil conspiracy claim asserted against Maley, Baker, and Myers.

### e. Gross Negligence - DHHS and DDSN

Plaintiffs' gross negligence cause of action contains 18 subparagraphs alleging specific acts or omissions on the part of DSS. (Am. Compl. ¶ 204(1)-(18). In regard to DHHS and DDSN, Plaintiff asserts that those two agencies had a special relationship with Matthew and that

> DDSN, DHHS and UMC were grossly negligent in failing to contact Matthew's treating physicians during the investigation and in the process of admitting Matthew to Clinton Manor, failing to comply with applicable state and federal standards of care and failing to obtain a PASARR and to determine whether institutionalization could be avoided by providing specialized services; diverting funds allocated to provide in-home services for other, unauthorized purposes and filing inflated cost reports with the federal government; and failing to comply with S.C. Code of Laws Ann. 44-20-450, which required due process and a court order to involuntarily admit Matthew to Clinton Manor.

(Id. ¶ 205, ECF No. 32.) However, at the pleading stage, Plaintiffs have alleged enough plausible facts to state a prima facie case of gross negligence against DHHS and DDSN. Accordingly, the court denies the motion to dismiss the gross negligence cause of action against DHHS and DDSN.

### f. Unjust Enrichment - DHHS and DDSN

Defendants DHHS and DDSN argue that the amended complaint fails to allege an essential element of an unjust enrichment claim, that a benefit was conferred on DHHS and DDSN by the Plaintiffs. (Mem. Supp. Mot. Dismiss 17, ECF No. 43-1.) Defendants assert that the amended complaint contains no allegation that the Plaintiffs made any payment to DHHS or DDSN. (Id. 17, ECF No. 43-1.) Plaintiffs made no response to this argument. Accordingly, this claim is dismissed.

45

### III. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Governor McMaster's motion to dismiss, docket number 42, is granted. The ADA/Section 504 claims against Governor McMaster in his official capacity are dismissed as duplicative.  Additionally, the § 1983 and civil conspiracy claims conceded by Plaintiffs in their response are dismissed.  It is further

**ORDERED** that the SRHS Defendants' motion to dismiss, docket number 41, is granted. The ADA/Section 504 claims against Defendants SRHCS and UMC are dismissed.  The remaining civil conspiracy and gross negligence causes of action against Dr. Washington and any "Roe" Defendants are dismissed pursuant to S.C. Code Ann. § 15-78-70(a).  The gross negligence and civil conspiracy claims asserted against Bradley are dismissed.  Further, the court grants the SRHS Defendants' motion to dismiss Plaintiffs' gross negligence, civil conspiracy, and unjust enrichment causes of action for failure to comply with the medical negligence presuit requirements.  Plaintiffs' § 1983 claim asserted against the SRHS defendants is the sole claim remaining.  It is further

**ORDERED** that Defendants Baker, Kerr, DHHS, Myers, Maley, Fry, DDSN, and LCDSNB's motion to dismiss, docket number 43, is granted in part and denied in part. The motion is denied as to the ADA/Section 504 claims asserted against DDSN, DHHS, and LCDSNB. The ADA/Section 504 claims against Defendants Kerr and Fry in their official capacities are dismissed as duplicative.  The motion is denied in regards to the § 1983 claim asserted against Baker and Maley.  Further, the § 1983 cause of action asserted against Defendant Myers is dismissed.  The motion is denied as to the state law civil conspiracy cause of action asserted against Baker, Kerr, and Myers. The court denies the motion in regards to the gross negligence claim asserted against DHHS and DDSN.  The unjust enrichment cause of action asserted against DHHS and DDSN is dismissed.

**IT IS SO ORDERED.**

s/Henry M. Herlong, Jr.
Senior United States District Judge

Greenville, South Carolina
February 14, 2022

46