IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| Matthew Thomas Parkins, by and through Andrew Turner, his next of friend and Guardian ad Litem, and Matt Parkins, Individually, | ) ) ) ) | |
| | ) | C.A. No. 7:21-2641-HMH |
| Plaintiffs, | ) ) | |
| | ) | **OPINION & ORDER** |
| vs. | ) ) | |
| The State of South Carolina, Henry Dargan McMaster, The Office of the Governor, Michael Leach, The South Carolina Department of Social Services, Calvin Hill, Tomekia Means, Joshua Baker, Robert Kerr, The South Carolina Department of Health and Human Services, Althea Myers, Patrick Maley, Michelle Gough Fry, The South Carolina Department of Disabilities and Special Needs, The Laurens County Disabilities and Special Needs Board, The Spartanburg Regional Health Care System, The Union Medical Center, Tonya Renee Washington, M.D., Jan Bradley, John Roe, and Jane Roe, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) ) | |
| Defendants. | ) | |

Before the court are two motions for summary judgment, one filed by Defendants Joshua

Baker ("Baker"), Robert Kerr ("Kerr"), the South Carolina Department of Health and Human

Services ("DHHS"), Althea Myers ("Myers"), Patrick Maley ("Maley"), the South Carolina

Department of Disabilities and Special Needs ("DDSN"), and the Laurens County Disabilities

and Special Needs Board ("Laurens County DSN Board") (collectively "DSN Defendants") and

the other filed by the South Carolina Department of Social Services ("DSS"), Michael Leach

("Leach"), Calvin Hill ("Hill"), and Tomekia Means ("Means") (collectively "DSS

Defendants").  For the reasons below, the court grants both motions.

## I. BACKGROUND

### A. Factual History

This case arises from the events surrounding Matthew Thomas Parkins' ("Matthew")

month-long stay in emergency protective custody ("EPC") in 2018.  Matthew was born with

congenital adrenal hypoplasia.  (Pls.' Resp. Opp'n DSN Defs.' Mot. Summ. J. Ex. 10 (UMC

Records 18), ECF No. 152-10.)  As a young child, he suffered an acute adrenal crisis, which led

to "profound and permanent developmental delay."  (Am. Compl. ¶ 23, ECF No. 32.)  Now 24-

years-old, Matthew is non-verbal, largely wheelchair-bound, and requires close monitoring of

his adrenal disorder.  (Am. Compl. ¶¶ 25, 34, ECF No. 32); (DSS Defs.' Mot. Summ. J. Ex. B

(Means Case Notes 2), ECF No. 142-2.)  Matthew's father, Matt Parkins ("Matt"), serves as his

primary caregiver and helps him with all daily-living activities.  (Am. Compl. ¶ 24, ECF No.

32.)

Because of Matthew's condition, he is eligible for and receives home- and community-

based care through South Carolina's Medicaid waiver program.  (Id. ¶ 29, ECF No. 32.)  That

program, established under 42 U.S.C. § 1396n(c) and administered by DDSN under contract

with DHHS, allows eligible persons with certain disabilities[1] to receive services at home rather

than in an institutional setting.  See generally Timpson v. Anderson Cnty. Disabilities & Special

Needs Bd., 31 F.4th 238, 244-45 (4th Cir. 2022).  Since obtaining a waiver program slot in

---

[1]  To be eligible, a participant must require the level of care provided in an intermediate
care facility for individuals with intellectual disabilities ("ICF/IID").

2014, Matthew has received case management services through the Union County Disabilities and Special Needs Board ("Union County DSN Board"). (DSN Defs.' Reply Ex. 1 (Priest Decl. ¶¶ 4-5), ECF No. 155-1.) His treatment has also been closely monitored throughout the years by Dr. James Amrhein ("Dr. Amrhein"), a pediatric endocrinologist; Lennie Mullis ("Mullis"), a licensed professional counselor; and Mary Katherine Bagnal ("Bagnal"), a masters-level social worker. (Am. Compl. ¶¶ 25, 31, 32, ECF No. 32.)

In spring 2018, 21-year-old Matthew was completing his senior year at Union High School. (Id. at ¶ 33, ECF No. 32.) On April 16, 2018, law enforcement responded to Union High School after staff noticed a handprint-shaped bruise on Matthew's left thigh and multiple bruises on his right thigh. (DSS Defs.' Mot. Summ. J. Ex. B (Means Case Notes 2), ECF No. 142-2.) Law enforcement promptly contacted DSS as required by South Carolina law, see S.C. Code Ann. § 43-35-55(D), and Means, a case worker with the Union County DSS, responded to investigate the potential abuse. Upon arriving at the school, Means met with the responding officer, a school resource officer, and two teachers. (DSS Defs.' Mot. Summ. J. Ex. B (Means Case Notes 5), ECF No. 142-2.) School staff explained that Matthew was "non-verbal, wheelchair bound, and suffers from unspecified cognitive disabilities." (Id. Ex. B (Means Case Notes 2), ECF No. 142-2.) Staff showed photos depicting bruises on Matthew's body in various stages of healing to the responding officer and Means and mentioned that Matthew had appeared at school the week before with a "busted lip and a bruise on his forehead." (Id. Ex. B (Means Case Notes 2, 5), ECF No. 142-2.) The responding officer then spoke with Matt and Andrew Turner ("Turner"), a part-time caregiver who often picked Matthew up from school. (Pls.' Resp. Opp'n DSN Defs.' Mot. Summ. J. Ex. 22 (GAL Report 2), ECF No. 153-1.) Apparently, neither

Matt nor Turner could adequately explain the cause of Matthew's bruises.  (Id. Ex. 22 (GAL Report 2), ECF No. 153-1.)  At this point, the responding officer placed Matthew in EPC based on his vulnerable condition and the extent of the bruising.  (DSS Defs.' Mot. Summ. J. Ex. D (Incident Report 2), ECF No. 142-4); see S.C. Code Ann. § 43-35-55(A).[2]

Matthew was transported by EMS to the emergency room at Union Medical Center ("UMC") that afternoon.  (DSS Defs.' Mot. Summ. J. Ex. D (Incident Report 2), ECF No. 142-4.)  Matthew was described as "happy and smiling" on arrival, and an examining physician assistant, Janet Wilson ("Wilson"), noted that his bruising was "consistent with lifting."  (Pl's. Resp. Opp'n DSN Defs.' Mot. Summ. J. Ex. 10 (UMC Records 18), ECF No. 152-10); (DSS Defs.' Mot. Summ. J. Ex. B (Means Case Notes 10), ECF No. 142-2.)  After a treatment plan was approved stating that Matthew would be discharged only after "a decision from the judge," his care was turned over to Defendant Tonya Renee Washington, M.D. ("Dr. Washington").  (Pls.' Resp. Opp'n Mot. J. Pleadings Ex. 1 (SRHS Records 12), ECF No. 117-2); (Am. Compl. ¶ 45, ECF No. 32.)

---

[2] That statute provides:

(A) A law enforcement officer may take a vulnerable adult in a life-threatening situation into protective custody if:
> (1) there is probable cause to believe that by reason of abuse, neglect, or exploitation there exists an imminent danger to the vulnerable adult's life or physical safety;
> (2) the vulnerable adult or caregiver does not consent to protective custody; and
> (3) there is not time to apply for a court order.

S.C. Code Ann. § 43-35-55(A).

The next day, April 17, Bagnal visited Matthew at UMC to photograph his bruises. (Am. Compl. ¶ 47, ECF No. 32.)  Bagnal also spoke with Means at some point over the phone, explaining that Matt most likely caused the bruising while changing Matthew's adult diaper. (Pls.' Resp. Opp'n DSN Defs.' Mot. Summ. J. Ex. 1 (Matt Parkins Aff. Ex. 10 at 115-16), ECF No. 152-1.)  Bagnal added "that Matt was an exceptional caregiver who would never intentionally injure his son" and requested that Matthew be returned home immediately.[3]  (Am. Compl. ¶ 48, ECF No. 32.)  Means replied that an investigation was ongoing and that while "[Bagnal] and her staff [were] more than welcome to voice an opinion," DSS had an obligation "to ensure [that] abuse and/or neglect [did] not exist in the home where Matthew Parkins reside[d]."  (DSS Defs.' Mot. Summ. J. Ex. B (Means Case Notes 12), ECF No. 142-2.)  The two also discussed the feasibility of moving Matthew to a less restrictive setting than UMC: Bagnal "offered to contact possible placements for Matthew," and Means "asked [Bagnal] to provide [her] the names of those of facilities in writing."  (DSS Defs.' Reply Ex. 1 (Means Aff. ¶ 10), ECF No. 156-1); (Pls.' Resp. Opp'n DSN Defs.' Mot. Summ. J. Ex. 1 (Matt Parkins Aff. Ex. 10 at 117), ECF No. 152-1.)

On April 18, a South Carolina family court held a probable cause hearing.  See S.C. Code Ann. § 43-35-55(F).  Noting testimony from the responding officer and Means that school officials had discovered "three different sets of bruis[es]" on Matthew within the last month, the

_____

[3] Mullis similarly maintains that she tried calling Means "at least 20 times" in an effort to have Matthew returned home.  (Pls.' Resp. Opp'n DSN Defs.' Mot. Summ. J. Ex. 31 (Mullis Aff. ¶ 5), ECF No. 153-10.)  Mullis claims that she never spoke with Means and was unable to leave a message, apparently because no voicemail box was set up.  (Id. Ex. 1 (Matt Parkins Aff. Ex. 12 at 167), ECF No. 152-1.)

family court agreed with DSS that probable cause existed for Matthew to be taken into protective custody. (Pls.' Resp. Opp'n DSS Defs.' Mot. Summ. J. Ex. Q (Hr'g Tr. 12), ECF No. 149-17.) The family court "admonish[ed]" DSS that an "expedited" investigation was warranted so that the matter would be ready for a merits hearing on May 23. (Id. Ex. Q (Hr'g Tr. 13), ECF No. 149-17.) The family court also issued a written order formally authorizing DSS to retain custody of Matthew and "to provide such routine and emergency medical care as may be required." (Pls.' Resp. Opp'n DSN Defs.' Mot. Summ. J. Ex. 19 (Family Ct. Order 4), ECF No. 152-19.)

The day after the probable cause hearing, April 19, Means again spoke with Bagnal about possible placements for Matthew during DSS's investigation. (DSS Defs.' Mot. Summ. J. Ex. B (Means Case Notes 16), ECF No. 142-2.) Bagnal had apparently proposed three options during their earlier April 17 conversation: (1) that Matthew be moved to an extended stay hotel where he would receive around-the-clock care from private sitters; (2) that Matthew be placed in the care of his grandparents; or (3) that Matthew be allowed to return home. (Pls.' Resp. Opp'n DSN Defs.' Mot. Summ. J. Ex. 1 (Matt Parkins Aff. Ex. 10 at 117-18), ECF No. 152-1.) Means informed Bagnal that none of these suggestions met Matthew's needs and thanked Bagnal for her assistance. (DSS Defs.' Mot. Summ. J. Ex. B (Means Case Notes 16), ECF No. 142-2.)

A few days later, on April 23, Means received a call from Defendant Jan Bradley ("Bradley"), Matthew's case manager at UMC, who "provided referral information for possible placements for Matthew." (Id. Ex. B (Means Case Notes 21), ECF No. 142-2.) Means mentioned that the Charles Lea Center had recently evaluated Matthew but did not have an available bed and that she was "calling other facilities to see if there are any openings." (Pls.'

Resp. Opp'n DSN Defs.' Mot. Summ. J. Ex. 38 (Bradley Case Notes 57), ECF No. 153-17.)

Later that day, Means and her supervisor, Hill, visited Matt's home to assess the safety of

Matthew's living environment. (DSS Defs.' Mot. Summ. J. Ex. B (Means Case Notes 22), ECF

No. 142-2.) Means noted, among other things, that the home was not handicap accessible and

that Matt had admitted to falling with Matthew several times in the past while caring for him in

the bathroom. (Id. Ex. B (Means Case Notes 22-23), ECF No. 142-2.)

On April 30, Means received a phone call from Angela Barber ("Barber"), Matthew's

new case manager with the Union County DSN Board. (Id. Ex. B (Means Case Notes 24), ECF

No. 142-2.) Barber told Means that she had heard from Matthew's previous case manager that

DSS was exploring placing Matthew at a facility in neighboring Laurens County. (DSN Defs.'

Mot. Summ. J. Ex. 1 (Priest Decl. Attach. A at 31), ECF No. 141-2.) Means confirmed that this

was correct, stating that she had recently contacted Jean Ramage ("Ramage") of the Laurens

County DSN Board. (Id. Ex. 1 (Priest Decl. Attach. A at 31), ECF No. 141-2.) Barber then

explained that "Matthew would need to be on a critical waiting list before any type of placement

could take place" and requested that Means provide her a summary of the allegations so she

could prepare a formal Request for Determination. (Id. Ex. 1 (Priest Decl. Attach. A at 30-31),

ECF No. 141-2.) Means sent Barber the summary, and Barber submitted the request. (Id. Ex. 1

(Priest Decl. Attach. A at 29), ECF No. 141-2.)

DDSN received the paperwork submitted by Barber the following day (Id. Ex. 1 (Priest

Decl. ¶ 6), ECF No. 141-2.) On the "County(ies) preferred" part of the request form, Barber

had added the following handwritten note: "Any – Laurens County has a vacancy and packet of

information has been sent to Residential Director [Ramage]." (Id. Ex. 1 (Priest Decl. Attach. A

at 6), ECF No. 141-2.) At the bottom of the form, Barber and the Union County DSN Board

executive director both had certified "that all efforts at the local level to resolve the situation

without resorting to out of home placement [had] been explored and implemented." (Id. Ex. 1

(Priest Decl. Attach. A at 6), ECF No. 141-2.)

On May 3, Means visited Matthew as part of her investigation to assess his "well-being,

his safety, and risks possibl[y] present during his stay at Union Medical Center." (DSS Defs.'

Mot. Summ. J. Ex B (Means Case Notes 26), ECF No. 142-2.)  Means also called Barber on

May 3 and May 7 to follow up on the status of the Request for Determination. (Id. Ex. B

(Means Case Notes 28, 29), ECF No. 142-2.)

On May 8, DDSN approved the request for DDSN residential services, agreeing with

Barber "that ICF/IID services were appropriate." (DSN Defs.' Mot. Summ. J. Ex. 1 (Priest

Decl. ¶ 10), ECF No. 141-2.)  This approval meant that Matthew "could be admitted to a

Community ICF/IID facility, to be chosen by his legal custodian," which, at the time, was DSS.

(Id. Ex. 1 (Priest Decl. ¶ 10), ECF No. 141-2.)  After being informed of the approval, Means met

with Ramage and Bradley at UMC to evaluate Matthew and discuss the logistics of transporting

him to Clinton Manor, an ICF/IID operated by the Laurens County DSN Board. (DSS Defs.'

Mot. Summ. J. Ex. B (Means Case Notes 38), ECF No. 142-2.)  The parties tentatively agreed

that Matthew would be moved to Clinton Manor the next Monday, May 14. (Id. Ex. B (Means

Case Notes 38), ECF No. 142-2.)  Barber was informed of this plan and began the process of

disenrolling Matthew from the waiver program. (DSN Defs.' Mot. Summ. J. Ex. 1 (Priest Decl.

Attach. A at 26), ECF No. 141-2.)

That Friday, May 11, Matthew's family and his attorney in this case, Patricia L. Harrison

("Harrison"), met with Means and a DSS attorney at UMC in an effort to prevent Matthew's

transfer. (Id. Ex. 1 (Priest Decl. Attach. A at 20-21), ECF No. 141-2.)  Harrison reportedly

became "very hostile" during the meeting and "had to [be] escort[ed] . . . out of the building." (Id. Ex. 1 (Priest Decl. Attach. A at 21), ECF No. 141-2.)  Harrison then went to the Union County DSN Board, where she advised the executive director that she represented Matthew's family and "was going to attempt to stop the placement on Monday and may go on over to the Family Court office today."  (Id. Ex. 5 (Maley Decl. Attach. A at 7), ECF No. 141-6.)  Harrison added that she "would be sending [the Union County DSN Board] a subpoena to obtain [its] records" and "was going to contact . . . . Maley, Interim Director [of DDSN]."  (Id. Ex. 5 (Maley Decl. Attach. A at 7), ECF No. 141-6.)  Right after Harrison's visit, Barber contacted a waiver coordinator with DDSN, informed her of the situation, and "requested that [Matthew] not be disenrolled [from the waiver program] at this time."  (Id. Ex. 1 (Priest Decl. Attach. A at 23), ECF No. 141-2.)  The waiver coordinator obliged, stating "that she would place this on hold until further notification."  (Id. Ex. 5 (Maley Decl. Attach. A at 7), ECF No. 141-6.)

Later that evening, the Laurens County DSN Board executive director told a senior DDSN official that he "did not want to place Matthew at Clinton Manor as scheduled on the following Monday until any legal disputes were resolved."  (Id. Ex. 2 (Tavenner Decl. ¶ 7), ECF No. 141-3.)  The official responded that "that was fine with him," and Matthew was not transferred to Clinton Manor on Monday, May 14, as originally scheduled.  (Id. Ex. 2 (Tavenner Decl. ¶¶ 7-8), ECF No. 141-3.)

On May 18, DSS staff met to discuss their findings.  After considering Means' observations, drug screens and background checks of Matt and his wife, Wilson's opinion that Matthew's bruises were consistent with lifting, an affidavit of Mullis, and input from law enforcement, DSS concluded that there was insufficient evidence of abuse or neglect.  (DSS Defs.' Mem. Supp. Mot. Summ. J. 9, ECF No. 142.)  Matthew was returned home the same day.

Matt formally regained legal custody of Matthew on May 23 after the DSS case was dismissed by the family court.

**B. Procedural History**

On April 15, 2021, Plaintiffs filed a 61-page, 513-paragraph complaint against 28 defendants in the Union County Court of Common Pleas.  (Not. Removal Ex. 1 (State Ct. Compl.), ECF No. 1-1.)  After the case was removed based on federal-question jurisdiction, the court instructed Plaintiffs to file an amended complaint, limited to 35 pages, that complied with Federal Rule of Civil Procedure 8(a)'s "short and plain statement" standard and Local Civil Rule 1.05's format requirements.  (Op. & Order 3, ECF No. 27.)  Plaintiffs filed the operative complaint on October 26, 2021, asserting claims for (1) violations of Title II of the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act; (2) violations of 42 U.S.C. § 1983; (3) civil conspiracy; (4) gross negligence; and (5) declaratory judgment and unjust enrichment.  (Am. Compl., ECF No. 32.)

On February 14, 2022, the court ruled on several motions to dismiss.  The court granted Defendant Henry Dargan McMaster's ("Governor McMaster") motion to dismiss; granted Defendants Bradley, Spartanburg Regional Health Care System, UMC, and Dr. Washington's (collectively "SRHS Defendants") motion to dismiss; and granted in part and denied in part Defendants Baker, Michelle Gough Fry, Kerr, Laurens County DSN Board, Maley, Myers, DDSN, and DHHS's motion to dismiss.  (Op. & Order 46, ECF No. 58.)  Then, on August 24, 2022, the court granted judgment on the pleadings for the SRHS Defendants on the sole remaining claim against them.  (Op. & Order 14, ECF No. 123.)  For clarity, the chart below outlines the claims remaining after the court's August 24 order:

10

| Count | Cause of Action | Defendants |
|---|---|---|
| I | ADA/Rehabilitation Act violation | DHHS, DDSN, Laurens County DSN Board, DSS, and Leach |
| II | § 1983 violation | Baker, Maley, Leach, Hill, and Means |
| III | Civil conspiracy | Baker, Maley, Kerr, Myers, Hill, and Means |
| IV | Gross negligence | DHHS, DDSN, DSS, Hill, and Means |

The DSN Defendants and DSS Defendants filed the instant motions for summary judgment on December 28, 2022, and December 29, 2022, respectively.  (DSN Defs.' Mot. Summ. J., ECF No. 141); (DSS Defs.' Mot. Summ. J., ECF No. 142.)  Plaintiffs responded in opposition to both motions on January 23, 2023.  (Pls.' Resp. Opp'n DSS Defs.' Mot. Summ. J., ECF No. 149); (Pls.' Resp. Opp'n DSN Defs.' Mot. Summ. J., ECF No. 152.)  Both sets of Defendants replied on January 30, 2023.  (DSN Defs.' Reply, ECF No. 155); (DSS Defs.' Reply, ECF No. 156.)  On February 16, 2023, Plaintiffs supplemented their response in opposition to the DSS Defendants' motion for summary judgment.  (Pls.' Suppl., ECF No. 170.)  These motions are ripe for review.

## II. LEGAL STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  The court views "all facts and reasonable inferences in the light most

favorable to the nonmoving party." Ballengee v. CBS Broad., Inc., 968 F.3d 344, 349 (4th Cir. 2020).

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party does so, the burden shifts to the nonmoving party to "go beyond the pleadings" and come forward with "specific facts showing that there is a genuine issue for trial." Id. at 324. Under this standard, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another," Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985).

### III. DISCUSSION

The DSN and DSS Defendants have moved for summary judgment on Plaintiffs' four remaining claims. The court considers each claim in turn.

### A. ADA/Section 504 (Count I)

Title II of the ADA prohibits public entities, including states and their instrumentalities, from denying the benefits of their services, programs, or activities to any "qualified individual with a disability . . . by reason of such disability." 42 U.S.C. §§ 12131(1), 12132. Section 504 of the Rehabilitation Act likewise prohibits recipients of federal funding from discriminating based on disability. 29 U.S.C. § 794(a). "Claims under the ADA's Title II and the Rehabilitation Act can be combined for analytical purposes because the analysis is 'substantially the same.'" Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty., 673 F.3d 333, 336 n.1 (4th Cir. 2012) (quoting Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1265 n.9 (4th Cir. 1995)).

To prevail under Title II or § 504, a plaintiff must show that (1) he "has a disability," (2) he is "otherwise qualified to receive the benefits of a public service, program, or activity," and (3) he was "denied the benefits of such service, program, or activity, or otherwise discriminated against," based on his disability. Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 498 (4th Cir. 2005). Defendants do not dispute that Matthew is disabled or that he is qualified to receive benefits under the waiver program, meaning only the third element is at issue.

One way Plaintiffs can prove discrimination under the third prong is by showing that Defendants failed to "administer [their] services, programs, and activities in the most integrated setting appropriate" to Matthew's needs. 28 C.F.R. § 35.130(d); see also 28 C.F.R. § 41.51(d) (imposing a similar requirement under the Rehabilitation Act). Known as the "integration mandate," this regulation was construed by the Supreme Court in Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581 (1999), to preclude the "unjustified institutional isolation of persons with disabilities." Id. at 600. The Court reasoned that the unnecessary institutionalization of disabled persons amounts to discrimination because it both "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life" and "severely diminishes [their] everyday life activities." Id. at 600-01. The Court held that states are therefore required to provide community-based treatment for disabled persons under Title II when "[1] the State's treatment professionals determine that such placement is appropriate, [2] the affected persons do not oppose such treatment, and [3] the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." Id. at 607.

In their amended complaint, Plaintiffs, citing <u>Olmstead</u>, allege that DDSN, DHHS, the Laurens County DSN Board, Leach, and DSS, along with other Defendants, "refused to provide services [to Matthew] in the least restrictive setting," (Am. Compl. ¶ 143, ECF No. 32), and instead "participated in a conspiracy to place Matthew in an [ICF/IID]," (<u>Id.</u> ¶ 155, ECF No. 32.) Plaintiffs specifically argue that the DSN and DSS Defendants violated Matthew's right to be free from unnecessary institutionalization during his stay at UMC by failing to explore less restrictive placement options.  Because of those inactions, Plaintiffs allege, Matthew was subjected to chemical and physical restraints at UMC leading to "mental and physical pain" and "both he and his father experienced anxiety and fear."  (<u>Id.</u> ¶ 154, ECF No. 32.)  As explained below, regardless of "whether there was an objective violation of [Matthew's] federally protected rights under the ADA," <u>Koon v. North Carolina</u>, 50 F.4th 398, 406 (4th Cir. 2022), summary judgment is appropriate because Plaintiffs cannot prove that the DSN and DSS Defendants were deliberately indifferent to those rights.

As an initial matter, the court underscores the context in which Plaintiffs' ADA claim arises.  DSS was awarded emergency protective custody of Matthew – a non-verbal, nonambulatory man with severe intellectual disabilities – after a family court found probable cause of abuse in the home.  DSS was then afforded 35 days, instead of the normal 40 days, to complete its investigation before a merits hearing and to prepare its recommendation as to the services that best fit Matthew's needs.  (DSS Defs.' Mot. Summ. J. Ex. A (APS Manual 28), ECF No. 142-1); S.C. Code Ann. § 43-35-45(D).  DSS completed its investigation early, found no evidence of abuse, and returned Matthew to his father before the merits hearing.  Most importantly, Matthew never was admitted to Clinton Manor.  Thus, because it is undisputed that

Matthew is currently living at home and was not disenrolled from the waiver program, there is no injunctive relief available, and "the only remedy left for [Plaintiffs] is monetary damages." Koon, 50 F.4th at 403. To recover money damages, though, Plaintiffs must show "at least" deliberate indifference. Id. at 400.

The Fourth Circuit recently addressed the framework for analyzing deliberate indifference in the ADA context in Koon v. North Carolina, 50 F.4th 398 (4th Cir. 2022). The Koon court explained that "the deliberate-indifference standard starts with determining whether there was – objectively speaking – an ongoing or likely violation of some federal right, and then moves on to determining whether a defendant had the appropriate mental state – subjectively speaking – toward that federal-rights violation." Id. at 404. In other words, a reviewing court must "look first to whether there was a likely or ongoing violation of federal rights. Only then may [it] move on to the mental state of deliberate indifference, which requires knowledge of a substantial risk of a deprivation of those rights and a failure to act to resolve that risk." Id. at 405.

With this framework in mind, the court considers first whether Plaintiffs have presented enough evidence from a which a reasonable jury could find that Matthew's ADA rights were violated. See id. at 405-06. Starting with DSS, there is at least some evidence that UMC was not the least restrictive environment in which Matthew could have been placed during DSS's month-long investigation. For example, Bagnal maintains that she approached Means the day before the probable cause hearing with a plan to move Matthew into an apartment with full-time caregivers, which would have allowed him to continue to attend school and receive his physical, occupational, and psychological therapies. (Pls.' Resp. Opp'n DSN Defs.' Mot. Summ J. Ex. 1

(Matt Parkins Aff. Ex. 10 at 117-20), ECF No. 152-1.)  Similarly, Matthew's grandparents claim

that they were able and willing to care for Matthew during the investigation but were not

contacted by DSS until a few days before he was returned home.  (Id. Ex. 4 (Brenda Parkins Aff.

¶¶ 4, 26-30), ECF No. 152-4); (Id. Ex. 5 (Roy Parkins Aff. ¶¶ 12, 16-18), ECF No. 152-5.)

Means, for her part, maintains that none of the options Bagnal suggested were able "to provide a

placement for Matthew due to his needs" and that DSS's efforts to place Matthew in a less

restrictive setting "were complicated by the services [he] needed and the unavailability of beds

in the facilities [DSS] inquired into."  (DSS Defs.' Reply Ex. 1 (Means Aff. ¶ 10), ECF No. 156-

1.)  In any event, whether or not any of this evidence creates a question of fact for a jury, none of

it rises to the "high bar" that is deliberate indifference.  Koon, 50 F.4th at 407.

> As explained by the Fourth Circuit:
>
> Simple failure to comply with the law is not deliberate indifference.  It is not enough
> simply to point to what could or should have been done.  That is the language of
> negligence.  Deliberate indifference requires a "deliberate or conscious choice" to
> ignore something.   That is more like criminal-law recklessness than mere
> negligence.  An official must know of the dangers to federal rights and nonetheless
> disregard them.  The official must know of the facts from which a federal-rights
> violation could be inferred and then actually draw the damning inference.

Id. at 406-07 (citations omitted).  In this case, there is no evidence that Means, Hill, or anyone

else at DSS "deliberate[ly] or concious[ly]" ignored Matthew's rights under the ADA.  Id. at

406.  Even a cursory review of Means' case notes reveals that she "did more than nothing" to

place Matthew in the least restrictive setting appropriate to his needs during DSS's expedited

investigation.  Id. at 407-08 & n.6 ("[G]ood-faith efforts to remedy the plaintiff's problems will

prevent finding deliberate indifference, absent extraordinary circumstances."); (DSS Defs.' Mot.

Summ. J. Ex. B (Means Case Notes 1-54), ECF No. 142-2.)  Means followed up on Bagnal's

suggestions for temporary placement but determined, in her professional judgment, that they were not suitable.[4] Cf. Olmstead, 527 U.S. at 602 ("[T]he State generally may rely on the reasonable assessments of its own professionals in determining whether an individual meets the essential eligibility requirements for habilitation in a community-based program." (internal quotations omitted)).  Moreover, any argument that DSS *should have* contacted Matthew's grandparents sooner is merely an "argument[] about what a reasonably prudent person would have done." Koon, 50 F.4th at 409.  Such argument "cannot be the basis of deliberate indifference." Id.

Turning next to the DSN Defendants, Plaintiffs cannot establish an ADA violation, let alone deliberate indifference.  Plaintiffs appear to argue that DHHS, as the state agency charged with supervising South Carolina's Medicaid programs, 42 U.S.C. § 1396a(a)(5); S.C. Code Ann. § 44-6-30(1), and by extension, DDSN, violated the ADA by not providing Matthew with in-home case management services while he was at UMC.  (Am. Compl. ¶ 155, ECF No. 32); (Pls.' Resp. Opp'n DSN Defs.' Mot. Summ J. 3, ECF No. 152.)  That argument ignores two important realities.  First, DSS had protective custody of Matthew after a family court found probable cause of abuse in the home; it would have been highly irresponsible for DSS to return Matthew to the setting of the alleged abuse before completing its investigation.  Cf. Rainey v. S.C. Dep't of Soc. Servs., 863 S.E.2d 470, 472 (S.C. Ct. App. 2021) (finding evidence of gross negligence where DSS allowed child with two unexplained subdural hematomas to be released from the hospital to his parents).  Second, the Union County DSN Board – and not DHHS or

---

[4] Plaintiffs' insinuation that Means was somehow unqualified to perform her duties as a case worker because she suffered a concussion five years earlier toes the line of frivolity under Federal Rule of Civil Procedure 11.

DDSN – provided Matthew's case management services under the waiver program.  See 42

C.F.R. §§ 440.169, 441.18; see also (DSN Defs.' Reply Ex. 1 (Priest Decl. ¶¶ 6-9), ECF No.

155-1.)  Further, even if Plaintiffs could make out an ADA violation against the DSN

Defendants, there is no evidence that any official with authority to take corrective action on

DHHS's or DDSN's behalf "actually knew a violation of [Matthew's] rights was substantially

likely."  Koon, 50 F.4th at 418 (Wynn, J., concurring in part and dissenting in part); Gebser v.

Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1989).  Plaintiffs do not refute DDSN's

assertion that its "records contain no reference to a request by anyone for any setting other than

an ICF/IID."  (DSN Defs.' Mot. Summ. J. Ex. 1 (Priest Decl. ¶ 13), ECF No. 141-2.)  In fact,

Mullis acknowledged as much in her deposition:

> Q: As far as you know, DDSN didn't do anything to stop [Matthew from being placed in an apartment with 24-hour care], is that correct, from happening?
>
> . . . .
>
> A: It was not information for DDSN.  It was not given to – it was not on the table for DDSN to make that decision.
>
> Q: So DDSN didn't make the decision.  Right?
>
> A: To live in a [sic] apartment, 24-hour care?
>
> Q: They didn't permit it, and they didn't prohibit it.
>
> A: I don't think that information was even available to them.

(DSN Defs.' Reply Ex. 3 (Mullis Dep. 153:24-154:10), ECF No. 155-3.)

In short, because Plaintiffs have not raised a genuine issue of material fact as to whether

any individual Defendant was deliberately indifferent to Matthew's rights under the ADA, the

DSN and DSS Defendants are entitled to summary judgment on Plaintiffs' ADA and Rehabilitation Act claims.

### B. Section 1983 (Count II)

Section 1983 imposes liability on any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State" subjects another "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983.  Thus, to recover under § 1983, a plaintiff must show that he was deprived of a right secured by the Constitution or laws of the United States by a person acting under color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988).  As explained below, Plaintiffs have failed to raise a genuine issue of material fact precluding summary judgment on their § 1983 claims against the DSN and DSS Defendants.

### 1. DSN Defendants – Baker and Maley

The only DSN Defendants remaining for purposes of Plaintiffs' § 1983 claims are Baker and Maley.  Baker, the DHHS Director from 2017 to 2021, and Maley, the interim DDSN Director in 2018, have both submitted declarations stating that they knew nothing about Matthew's situation and were not involved in approving his transfer to Clinton Manor.  (DSN Defs.' Mot. Summ. J. Ex. 4 (Maley Decl. ¶ 4, ECF No. 141-5); (Id. Ex. 5 (Maley Decl. ¶¶ 6, 9, 10, 11, 15), ECF No. 141-6.)  Plaintiffs have put forth no evidence to the contrary[5] and instead rely heavily on the allegations in their complaint.  (Pls.' Resp. DSN Defs.' Mot. Summ. J. 11, ECF No. 152) ("Plaintiffs alleged that Defendants Baker and Maley. . . ."); (Id. 11, ECF No. 152) ("They allege that these Defendants . . . ."); (Id. 11-12, ECF No. 152) ("Plaintiffs alleged

_____

[5] Plaintiffs did not depose Baker or Maley.

that . . . ."); (Id. 14, ECF No. 152) ("Here, Plaintiffs have alleged . . . .").  Thus, Baker and

Maley are entitled to summary judgment on the claim that they conspired with others to "seiz[e]

and hold[] Matthew in unconstitutional conditions."  (Am. Compl. ¶ 167, ECF No. 32); Liberty

Lobby, 477 U.S. at 248 ("[A] party opposing a properly supported motion for summary

judgment may not rest upon the mere allegations or denials of his pleading . . . ." (internal

quotation marks omitted)).

Plaintiffs' next argument – that Baker and Maley schemed to improperly divert funds

intended to benefit waiver program participants – also fails.  Quite simply, Plaintiffs have

marshaled no evidence showing how they were injured by the alleged mishandling of funds.[6]

For this same reason, the court denies Plaintiffs' requests to enjoin DHHS and DDSN "from

diverting funds allocated by the General Assembly for in-home services for other purposes" and

to order "the State to establish and [sic] Olmstead Plan, as requested by advocacy organizations

in [one of their exhibits]."[7]  (Pls.' Resp. Opp'n DSN Defs.' Mot. Summ. J. 14-15, ECF No.

152.)

Finally, Plaintiffs raise several undeveloped arguments related to the decision to approve

Matthew's placement at Clinton Manor.  They contend that Baker and Maley (along with others)

violated their "rights enforceable under Section 1983" by failing to (1) comply with Pre-

_____

[6] This is not the first time Plaintiffs' counsel has offered only "vague allegations of
nefarious dealings" by the DSN Defendants and failed to "substantiat[e] the[] claims or
connect[] them in any way to" her client's treatment and care.  Est. of Valentine by and through
Grate v. South Carolina, No. 3:18-00895-JFA, 2021 WL 3423353, at *5 (D.S.C. Aug. 5, 2021)
(unpublished); Timpson by and through Timpson v. Anderson Cnty. Disabilities and Special
Needs Bd., 31 F.4th 238, 257 (4th Cir. 2022).

[7] Plaintiffs' requests for prospective relief also fail because Baker and Maley were sued
in their individual capacities and are no longer in charge of the respective agencies.

Admission Screening and Resident Review ("PASRR") provisions of the Nursing Home Reform Act, 42 U.S.C. § 1396r; (2) comply with the fair hearing requirements of the Medicaid Act, 42 U.S.C. § 1396a(a)(3); 42 C.F.R. § 431.206; and (3) initiate involuntary commitment proceedings under S.C. Code Ann. § 44-20-450.  (Am. Compl. ¶¶ 180-81, 187, 191, ECF No. 32.)  These claims fail because Plaintiffs have adduced no evidence showing how they were harmed by these alleged inactions; again, Matthew was never transferred to Clinton Manor or disenrolled from the waiver program.  See Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982) ("Section 1983 is a tort statute. A tort to be actionable requires injury.")

### 2. DSS Defendants – Leach, Hill, and Means[8]

Though somewhat unclear, Plaintiffs appear to argue that Hill and Means violated the Fourth and Fourteenth Amendments by placing Matthew in emergency protective custody, failing to notify Matt of the probable cause hearing, and then falsely testifying at the hearing.[9] (Am. Compl. ¶¶ 164-66, ECF No. 32); (Pls.' Resp. Opp'n DSS Defs.' Mot. Summ. J. 9-12, ECF No. 149.)  In response, Hill and Means claim that they are entitled to absolute immunity or, at the very least, qualified immunity.  (DSS Defs.' Mem. Supp. Mot. Summ. J. 12-16, ECF No. 142.)

_____

[8] Leach is entitled to summary judgment on Plaintiffs' § 1983 claim against him in his official capacity; state officials acting in their official capacities are not "persons" within the meaning of § 1983.  Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989).

[9] To the extent that Plaintiffs argue that their substantive due process rights to family integrity were violated, see Troxel v. Granville, 530 U.S. 57, 65 (2000), that contention is unavailing because Matthew's placement in protective custody was "based upon *some evidence* of . . . abuse." Weller v. Dep't of Soc. Servs., 901 F.2d 387, 391 (4th Cir. 1990) (emphasis added); see also Cnty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1998) (stating that the shocks-the-conscience standard is reserved for "only the most egregious official conduct").

Qualified immunity shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To determine whether qualified immunity applies, the court asks whether "the facts alleged show the [official's] conduct violated a constitutional right" and "whether the right was clearly established." Saucier v. Katz, 533 U.S. 194, 201 (2001). The court, in its "sound discretion," may decide the order in which to address the two prongs. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

Absolute immunity, on the other hand, attaches when government officials, including social workers, engage in "activities . . . that could be deemed prosecutorial." Vosburg. Dep't of Soc. Servs., 884 F.2d 133, 138 (4th Cir. 1989); see also Butz v. Economou, 438 U.S. 478, 512 (1978) (explaining that absolute immunity is "necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation"). In deciding which form of immunity applies, the court takes a "functional approach," focusing not on the official's "status" or "title," but on "the nature of [his or her] responsibilities." Cleavinger v. Saxner, 474 U.S. 193, 201 (1985). At bottom, the key is whether the challenged conduct is "closely associated with the judicial process." Burns v. Reed, 500 U.S. 478, 495 (1991).

To begin, the court finds that Means is entitled to absolute immunity from liability for any claims arising from her testimony at the probable cause hearing. That remains true even if she "intentionally misrepresent[ed] [Matthew's] case to the [family court]." (Am. Compl. ¶ 165, ECF No. 32); see Booker v. S.C. Dep't of Soc. Servs., 583 F. App'x 147, 148 (4th Cir. Sept. 9,

2014) (unpublished); Rogers v. Cumberland Cnty. Dep't of Soc. Servs., No. 5:20-CV-477-BO,

2022 WL 1132153, at *10 (E.D.N.C. Feb. 1, 2022) (unpublished); Sahoo v. Gleaton, No.

5:16-cv-153-F, 2017 WL 1102623, at * 9 (E.D.N.C. Mar. 23, 2017) (unpublished); cf. Fleming

v. Asbill, 42 F.3d 886, 889 (4th Cir. 1994) ("Even if [the guardian ad litem] lied to the judge in

open court, she was still acting as the guardian, and is immune from § 1983 liability.")

      Next, Means and Hill are entitled to qualified immunity on Plaintiffs' claim that

Matthew's placement in protective custody violated the Fourth Amendment.  The Fourth

Amendment guarantees "[t]he right of the people to be secure in their persons . . . against

unreasonable searches and seizures . . . ."  U.S. Const. amend. XIV, § 1, cl. 3.  The Fourth

Amendment's protections, however, are "personal" and "may not be vicariously asserted."

Alderman v. United States, 394 U.S. 165, 174 (1969).  Matt therefore cannot assert a Fourth

Amendment claim on Matthew's behalf.  See, e.g., Parker v. Austin, 105 F. Supp. 3d 592, 598

(W.D. Va. 2015); Frederick v. W. Va. Dep't of Health and Human Servs., No. 2:18-cv-01077,

2019 WL 1198027, at *17 (S.D. W. Va. Feb. 15, 2019) (unpublished).  At the same time,

Matthew's Fourth Amendment claim fails on the merits because law enforcement – and not

Means or Hill – placed Matthew in emergency protective custody.  (Pls.' Resp. Opp'n DSS

Defs. Mot. Summ. J. 11, ECF No. 149) (conceding this point).

      Finally, Means and Hill are entitled to qualified immunity on Matt's claim that they

violated his procedural due process rights by failing to serve him with the family court pleadings

before the probable cause hearing.  Due process requires that notice be "reasonably calculated,

under all the circumstances, to apprise interested parties of the pendency of the action and afford

them an opportunity to present their objections."  Mullane v. Cent. Hanover Bank & Tr. Co.,

339 U.S. 306, 314 (1950). Matt admits that Means told him at Union High School "that there would be a hearing on April 18, 2018." (Pls.' Resp. Opp'n DSN Defs.' Mot. Summ. J. Ex. 1 (Matt Parkins Aff. 4), ECF No. 152-1.) Matt then attended the hearing and even cross-examined Means. (Pls.' Resp. Opp'n DSS Defs.' Mot. Summ. J. Ex. Q (Hr'g Tr. 9-10), ECF No. 149-17.) As a result, any argument that Matt was not given "fair notice of impending state action" lacks merit. Snider Int'l Corp. v. Town of Forest Heights, Md., 739 F.3d 140, 146 (4th Cir. 2014).

### C. Civil Conspiracy (Count III)

To recover on a civil conspiracy claim, a plaintiff must prove four elements: "(1) the combination or agreement of two or more persons, (2) to commit an unlawful act or a lawful act by unlawful means, (3) together with the commission of an overt act in furtherance of the agreement, and (4) damages proximately resulting to the plaintiff." Paradis v. Charleston Cty. Sch. Dist., 861 S.E.2d 774, 780 (S.C. 2021). Because "civil conspiracy is an intentional tort, an intent to harm . . . [is] an inherent part of th[is] analysis." Id. at 780 n.9.

The thrust of Plaintiffs' civil conspiracy claim is that Baker, Kerr, Myers, Maley, Hill, Means and now-dismissed Defendants Governor McMaster, Bradley, and Washington conspired to funnel Matthew and other waiver program participants into the most restrictive – and profitable – facilities in the DDSN system. (Am. Compl. ¶ 196, ECF No. 32.) Plaintiffs' claim fails, however, for two reasons. First, Plaintiffs have pointed to no facts showing that the six remaining Defendants reached any sort of agreement, much less one to act unlawfully and harm Plaintiffs. In fact, Kerr was not even employed by the State of South Carolina from 2007 to

2021;[10] Myers was misidentified by Plaintiffs;[11] and Baker's and Maley's unrefuted declarations reveal that they were not involved in Matthew's placement at UMC or the decision to transfer him to Clinton Manor.  This would leave Hill and Means as the only conspiracy participants, but employees of the same agency cannot conspire with one another, absent some showing that they had a personal stake in the conspiracy.  Cricket Cove Ventures, LLC v. Gilland, 701 S.E.2d 39, 46-47 (S.C. Ct. App. 2010); Pridgen v. Ward, 705 S.E.2d 58, 62 (S.C. Ct. App. 2010).

Second, Plaintiffs have submitted no evidence showing that the DSN and DSS Defendants "acted in furtherance of the conspiracy in a manner separate and independent from [their] other causes of action."  Jinks v. Sea Pines Resort, LLC, No. 9:21-cv-00138-DCN, 2021 WL 4711408, at *3 (D.S.C. Oct. 8, 2021) (unpublished); Todd v. S.C. Farm Bureau Mut. Ins. Co., 278 S.E.2d 607, 611 (S.C. 1981), overruled on other grounds by Paradis, 861 S.E.2d at 780. Instead, Plaintiffs' civil conspiracy claim is based on the same allegations underlying their ADA, § 1983, and gross negligence claims.  Compare (Am. Compl. ¶¶ 196-99, ECF No. 32) with (Id. ¶¶ 143, 148, 165, 166, 170, 191, 205, ECF No. 32.)  For these reasons, the DSN and DSS Defendants are entitled to summary judgment on Count III.

### D. Gross Negligence (Count IV)

The South Carolina Tort Claims Act ("SCTCA") is the exclusive remedy for torts committed by employees of state agencies.  S.C. Code Ann. § 15-78-70(a).  Under the SCTCA, state agencies are liable for their torts "in the same manner and to the same extent" as private

---

[10] (DSN Defs. Mot. Summ. J. Ex. 6 (Kerr Decl. ¶¶ 3-4), ECF No. 141-7.)

[11] Plaintiffs have not refuted Myers' assertion that she is not the "Althea at Community Long Term Care" referenced in Matthew's hospital records.  (DSN Defs.' Mot. Summ. J. Ex. 3 (Myers Decl. ¶ 7), ECF No. 141-4.)

individuals.  Id. § 15-78-40.  The SCTCA, however, carves out several exceptions to this general

waiver of immunity.  Relevant here is S.C. Code Ann. § 15-78-60(25), which provides that a

"governmental entity is not liable for a loss resulting from . . . responsibility or duty including

but not limited to supervision, protection, control, confinement, or custody of any . . . patient . . .

or client of any governmental entity, *except when the responsibility or duty is exercised in a

grossly negligent manner*."  S.C. Code Ann. § 15-78-60(25) (emphasis added).  "Gross

negligence is the intentional conscious failure to do something which it is incumbent upon one

to do or the doing of a thing intentionally that one ought not to do."  Etheredge v. Richland Sch.

Dist. One, 534 S.E.2d 275, 277 (2000).  In other words, "[i]t is the failure to exercise slight

care."  Id.  Although whether conduct constitutes gross negligence is normally a mixed question

of law and fact, "when the evidence supports but one reasonable inference, the question

becomes a matter of law for the court."  Id.

### 1. DSN Defendants – DHHS and DDSN

Matthew maintains that DHHS and DDSN owed him a duty of care as a waiver program

participant and that they breached that duty by not completing a PASRR, contacting his

treatment team, and obtaining a court order before his scheduled transfer to Clinton Manor.

(Am. Compl. ¶¶ 203, 205, ECF No. 32.)  Matthew's gross negligence claim fails, however, for

the same reason that his § 1983 claim fails: Matthew has pointed to no evidence showing how

he was injured by DHHS's and DDSN's inactions since he remained a waiver program

participant and never went to Clinton Manor or any other ICF/IID.  The DSN Defendants are

therefore entitled to summary judgment on Count IV.  See Madison v. Babcock Ctr., Inc., 638

S.E.2d 650, 660 (S.C. 2006) (explaining that the SCTCA's exceptions to the waiver of

governmental immunity are considered only "[w]hen a governmental entity owes a duty of care to a plaintiff under the common law *and other elements of negligence are shown*" (emphasis added)).

### 2. DSS Defendants – DSS, Means, and Hill

To begin, the court finds that Means and Hill are entitled to immunity under the SCTCA on Plaintiffs' gross negligence claims.  The SCTCA "is the exclusive and sole remedy for any tort committed by an employee of a governmental entity while acting within the scope of the employee's official duty." S.C. Code Ann. § 15-78-200.  Means and Hill were at all times acting within the scope of their official duties as DSS employees in investigating the potential abuse of Matthew.  See id. § 15-78-30(i) ("'Scope of official duty' . . . means (1) acting in and about the official business of a governmental entity and (2) performing official duties.")  Under the SCTCA, government employees are immune from liability for torts committed within the scope of their official duties as long as their conduct does not amount to "actual fraud, actual malice, intent to harm, or a crime involving moral turpitude." S.C. Code Ann. § 15-78-70(a)-(b); Shelley v. S.C. Highway Patrol, 852 S.E.2d 220, 225 (S.C. Ct. App. 2020).  To this end, there is no evidence to suggest that Means and Hill intended to harm Plaintiffs or acted with malice during their investigation.  Means and Hill thus remain immune from tort liability under the SCTCA and are entitled to summary judgment on Plaintiffs' gross negligence claims.  See, e.g., Smith v. Ozmint, 394 F. Supp. 2d 787, 792 (D.S.C. 2005); Beaufort v. Thompson, No. 2:20-cv-01197-DCN-MGB, 2021 WL 1085313, at *6 (D.S.C. Mar. 22, 2021) (unpublished).

Next, the court finds that Matt's gross negligence claim against DSS is time-barred by the SCTCA's two-year statute of limitations.  S.C. Code Ann. § 15-78-110 ("[A]ny action

brought pursuant to this chapter is forever barred unless an action is commenced within two years after the date the loss was or should have been discovered.")  The events giving rise to this lawsuit took place between April 16, 2018, and May 23, 2018.  Because Plaintiffs did not file a verified claim, <u>see</u> S.C. Code Ann. § 15-78-80, and waited until April 15, 2021, to file suit, Matt's gross negligence claim against DSS is untimely under the SCTCA.

This leaves Matthew's gross negligence claim against DSS.  In opposing DSS's motion for summary judgment on this count, Plaintiffs offer only a single sentence:

> Based upon the evidence presented by the Plaintiffs, it is a jury question as to whether SCDSS demonstrated slight care in the investigation, seizure, and continued seizure of Matthew Parkins.

(Pls.' Resp. Opp'n DSS Defs. Mot. Summ. J. 14, ECF No. 149.)  Plaintiffs' deficient briefing has the made the court's task in ruling on DSS's motion needlessly difficult.  It is not the court's responsibility to sift through the record in search of material facts, <u>United States v. Dunkel</u>, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in [the record]."), nor is it the court's job to "put flesh on [the] bones" of the parties' "skeletal" arguments.  <u>United States v. Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990)  Rather, litigants must

"spell out [their] arguments squarely and distinctly, or else forever hold [their] peace."[12] Id.
(internal quotations and citations omitted).

With that said, the court has reviewed the record and found no issue of material fact as to
whether DSS was grossly negligent during its investigation. First, as discussed above, DSS
exercised at least slight care in trying to place Matthew in the least restrictive environment
appropriate to his needs. Means contacted several facilities, followed up on Bagnal's suggestions,
and eventually arranged for a home study of Matthew's grandparents. (DSS Defs.' Mot. Summ. J.
Ex. B (Means Case Notes 12, 13, 16, 21, 24, ECF No. 142-2); (Pls.' Resp. Opp'n DSN Defs.' Mot.
Summ. J. Ex. 38 (Bradley Case Notes 57), ECF No. 153-17); (Id. Ex. 4 (Brenda Parkins Aff. ¶ 27),
ECF No. 152-4.) "The fact that more might have been done does not negate a finding that [DSS's]
employees exercised at least slight care" in attempting to place Matthew outside of UMC. Pack v.
Associated Marine Insts., Inc., 608 S.E.2d 134, 138 (S.C. Ct. App. 2004).

Likewise, the only inference that can be drawn from the record is that DSS exercised at least
slight care in conducting the investigation itself. DSS responded to Union High School within an
hour after being contacted by law enforcement, visited Matthew several times at UMC, conducted
a home visit, interviewed Matthew's parents and his siblings, and considered the input of Mullis,

---

[12] The court takes this opportunity to remind Plaintiffs' counsel of their obligations under
Local Civil Rule 7.06. That rules provides:

> Any response supported by discovery material shall specify with particularity the
> portion of the discovery material relied upon in support of counsel's position,
> summarize the material in support of counsel's position, and attach relevant portions
> of the discovery material or deposition.

Local Civ. Rule 7.06 (D.S.C.).

Wilson, and law enforcement before returning Matthew to his father.  (DSS Defs.' Mot. Summ. J. Ex. D (Incident Report 2), ECF No. 142-4); (Id. Ex. B (Means Case Notes 5-8, 10, 22-23, 26, 38), ECF No. 142-2); (DSS Defs.' Mem. Supp. Mot. Summ. J. 9, ECF No. 142); (Pls.' Resp. Opp'n DSS Defs.' Mot. Summ. J. Ex. M (Matt Parkins Aff. Ex. 3 at 73-79), ECF No. 149-13.)  Plaintiffs emphasize that Dr. Amhrein, Matthew's treating endocrinologist, was not consulted during DSS's investigation.  To be sure, the failure to contact a vulnerable adult's medical treatment providers in the post-EPC setting may, in some cases, be evidence of gross negligence – especially when medical neglect is implicated.  For example, in Bass v. S.C. Department of Social Services, 780 S.E.2d 252 (S.C. 2015), the South Carolina Supreme Court reinstated a jury verdict finding DSS grossly negligent where DSS removed two autistic children suspected of being poisoned by their parents, yet failed to test the medication in question or contact the children's doctors after placing the children in EPC.  Id. at 254-55. The children remained out of the home for a month, returning only after the compounding pharmacy's insurer informed the mother that the medication had been "inadvertently mixed at one thousand times the recommended concentration."  Id. at 254.

Bass, however, is readily distinguishable.  The undisputed facts here show that DSS encountered a situation where: (1) multiple bruises – including one in the shape of a handprint – were discovered on a non-verbal, wheelchair-bound student with "unspecified cognitive disabilities"; (2) the student had recently arrived at school with "a busted lip and a bruise on his forehead"; and (3) the possible perpetrators were identified as the student's primary caregivers – neither of whom could initially explain the cause of the bruises.  (DSS Mot. Summ. J. Ex. B (Means Case Notes 2), ECF No. 142-2.)  Thus, unlike in Bass, where DSS would have conclusively determined the cause of the poisoning had it simply tested the medication, there was no clear-cut

30

answer to whether Matthew's injuries were accidental or caused by intentional abuse.  More to the point, even if DSS had sought Dr. Amhrein's opinion, it remained obligated to conduct a thorough investigation into Matthew's living environment, his financial situation, his familial relationships, the background of his caregivers, and so forth.  (DSS Mot. Summ. J. Ex. A (APS Manual 8-20), ECF No. 142-1) (listing over 20 client, environmental, and caregiver factors that caseworkers must consider during an investigation).  The court's review of the record reveals that DSS did just that and returned Matthew home five days before the scheduled merits hearing.  As a result, because "the only reasonable inference that can be drawn from these facts is that [DSS], at the very least, exercised slight care" in carrying out its investigation, Clyburn v. Sumter Cnty. Sch. Dist. No. 17, 451 S.E.2d 885, 888 (S.C. 1994), the court grants summary judgment to DSS on Count IV.

It is therefore

**ORDERED** that the DSN Defendants' and the DSS Defendants' motions for summary judgment, docket numbers 141 and 142, are granted.

**IT IS SO ORDERED.**

s/ Henry M. Herlong, Jr.
Senior United States District Judge

Greenville, South Carolina
February 27, 2023

31